PRESTON *v.* BOARD OF WATER COMMISSIONERS OF
DETROIT.[1]

1. MUNICIPAL CORPORATIONS—WATER RATES—UNIFORMITY.

Water rates paid to a city by consumers are in no sense taxes,
but are merely the price of a commodity; therefore, it is not
necessary that they be uniform, or that they be based upon
property values.

2. SAME—WATERWORKS—COST OF CONSTRUCTION AND EXTENSION
—HOW PAID.

A city is not obliged, by reason of its ownership of a water
plant, to make the cost of its construction and extension a
general city charge, but it may properly derive a profit from
consumers, and apply the same in payment of the cost of the
plant.

3. SAME—FREE WATER TO PUBLIC INSTITUTIONS—RIGHT OF CON-
SUMER TO COMPLAIN.

Where the water rates paid to a city by consumers are reason-
able in amount, they cannot complain of them as inequitable
because the water commissioners, whose duty it was to assess
the rates "upon such basis as they shall deem equitable,"
have supplied water either free or at nominal rates to the
various city departments, and to charitable and educational
institutions in which the public are more or less interested.

Cross-appeals from Wayne; Frazer, J. Submitted June
17, 1898. Decided July 12, 1898.

Bill by Marvin Preston and others against the board of
water commissioners of the city of Detroit to restrain the
collection of water rates as assessed by said board. From
the decree rendered, all parties appeal. Reversed and bill
dismissed.

*John W. McGrath*, for complainants.

*Fred A. Baker*, for defendant. .

[1] Rehearing denied September 27, 1898.

MOORE, J. Stated in the language of the solicitor for complainants:

"This bill was filed in 1890, to restrain the collection of water rates as assessed, on the ground that the basis of the assessment was and is radically inequitable and contrary to law.

"1. That if the defendant has the right to include in the assessment of rates the expenses of extension and construction, and the payment of the bonded debt, as well as the operating expenses:

"(a) It must assess for public uses as well as for private.

"(b) It has no right to discriminate between consumers, or to exempt any uses.

"(c) It has no right to furnish water free to the public, to the board of education, or to charitable institutions.

"(d) It has no right to use the moneys collected as water rates for uses not directly associated with the subject of furnishing a water supply.

"2. That the water plant was constructed and exists for public as well as private use. The capacity of the plant is enlarged because of the public demands upon it for fire protection, park, and other public uses, and because of the probability of increased demands upon it in the future. Hence, in any event, a large part of the cost of the plant, and of additions thereto, should be borne by the general public.

"3. That the plant belongs to the municipality, and not to the private consumer, and its cost, including the payment of the bonded debt, should be made a general city charge.

"4. That the charter of the city, and the acts under which the bonds were issued, contemplate the payment of the bonded debt and the interest thereon, as well as the cost of extension and construction, by the city, and not by the private consumer."

Testimony was taken before a commissioner, who found, among other things, as follows:

"(1) I find the total sum charged against said complainants from July 1, 1890, to January 1, 1897, to be the sum of $1,172.64; and if no deductions are to be made on account of the use by the public of water, the free use of water by certain private individuals, the use of water

by other private individuals, corporations, or charities, for which a nominal charge only has been made, and the cost of construction and extension of the works, the expenditures for the payment of interest and bonded debt, as well as the operating expenses, are to be made a charge against the consumers of water, then I find the above-named sum of $1,172.64 to be due from the complainants named.

"(2) I find that table No. 1, as the same appears in Exhibit A, hereto attached, is a correct statement of the amounts expended by the defendant for construction, the payment of interest, the payment of bonds, and the operating expenses of said board, together with the total water rates assessed and collected from July 1, 1890, to January 1, 1897, and that the total expenditures for construction, interest, bonds, and the operation during said period were $3,557,545.39.

"I find that the board of education, from July 1, 1890, to July 1, 1894, paid the nominal rate of $1,000 per annum, whereas, if charged as other private consumers, it should have paid $7,000 per annum; and that from July 1, 1894, to January 1, 1897, the schools were metered, and the board of education was charged and paid at the rate of two cents per thousand gallons, whereas the rates charged on other consumers of water were six and two-thirds and two and two-thirds cents per thousand gallons; and that the difference between what the board actually paid and what it should have paid is the sum of $27,031. I find that from July 1, 1890, to January 1, 1897, the board expended, from sums collected as water rates, on account of the Hurlbut fund, $66,014.60 in excess of the receipts from the Hurlbut estate. I find that up to 1888 or 1889 the board had charged to consumers having hose connection four dollars per annum each, and there were 6,500 hose connections in the city of Detroit; that in 1888 the board ceased to charge for hose connections, and since said time the number of hose connections has more than doubled; that the amount consumed for lawn sprinkling purposes from hose connections amounts to one-thirteenth of the entire pumpage, and, therefore, that the persons using said hose connections should pay one-thirteenth of the entire water rate imposed.

"I find further that the public uses four per cent. of the amount of water actually used, which would be about six and two-tenths per cent. of the entire pumpage; and that the municipality, if it paid its proper share for the use of water, should have paid for the period named six and two-

tenths per cent. of the entire water rates, or $164,904.10. I find that the amount actually paid by the city of Detroit as water rates for all public purposes, from July 1, 1890, to January 1, 1897, in all departments except the house of correction, as appears by Exhibit B, hereto attached, was the sum of $5,518.04; and the city should have paid $164,-904.10 less $5,518.04.

"These sums are correctly tabulated in table No. 2 of Exhibit A, hereto attached, and the total thereof equals eighteen per cent. of the total rates; and, if they should be deducted, then eighteen per cent. should be deducted from the amount claimed from said complainants, leaving the balance $961.57."

The circuit judge filed a written opinion in the case. The essential part of it reads as follows:

"But it is claimed by complainants' counsel that the manner in which water rates are determined, whether by meter or otherwise, is inequitable, and not within the power of the board of commissioners. The charter provides that the commissioners shall cause to be assessed water rates upon such basis as they shall deem equitable; and the question to be determined in this case is whether the commissioners have the power to assess water rates in the manner they are now doing. The water rates collected by the board of commissioners is the only source of revenue provided for the running expenses of the waterworks. This, of course, includes all that is paid out by the commissioners in labor, fuel, and such other expenses as are necessary to supply all the water that is consumed for all purposes in the entire city, and the whole of this expense is paid for by those consumers of water upon whom the water rates are assessed. The following use large quantities of water, and pay either no water rates, or nominal rates, entirely disproportioned to the amount of water used:

"Public institutions, or those in which the entire public is interested.

"Board of education pays $1,071, about one-seventh of what it would have to pay if charged at the rate as that charged consumers who have meters.

"Board of public works pays nothing for water used by it.

"Municipal buildings pay a nominal rate.

"Park board pays no rates.

"All public fountains are furnished water free.

"Police department is charged nothing.

"Fire department pays no water rates.

"Markets pay nothing.

"All private charities and hospitals are furnished water by the board on the city paying the nominal sum of $1,000.

"Cemeteries pay nothing.

"The question now presents itself whether the board of commissioners, under the power given them to assess water rates upon such basis as they shall deem equitable, have the right to give water away to a certain class of consumers, and make another certain class of consumers pay for it. This is not my idea of what is equitable, and the fact that the commissioners may deem it equitable will not prevent the courts from interfering when the act done is clearly and manifestly inequitable. All water that is used by the city, the fire department, board of public works, park commission, and all other public institutions, is used for the benefit of the general public. A man who owns a vacant lot is as much interested in having water in the streets, fire protection, clean streets, and public fountains as his neighbor who owns a house and has a water tap in it, for all these things increase the value of his vacant property; and there is no justice or equity in his reaping these benefits, and having his neighbor pay for it, because he has built a house beside his vacant lot, and uses water. It might as well be argued that if the city owned a public lighting plant, and was authorized to furnish light to the houses of citizens on payment of proper rates, the users of electric lights should alone be charged with the expense of lighting the streets and vacant property of the city. The equitable power given the water commissioners should be so exercised as to assess rates on all alike. Those institutions which are private should pay the same as other private interests do, and those that are public should pay, and whatever it costs the public can be assessed as a general tax, and thus the burden for these public benefits will be borne alike by all taxpayers. The expense of maintaining the police department, fire department, schools, parks, etc., is borne now by the general taxpayer; and why should he not pay for the water they use which is necessary to their successful maintenance? I think the board of water commissioners have no authority to give water to one person, and make another one pay for it."

117 MICH.—38.

Acting upon the report of the commissioner, the circuit judge decided the water board was charging the complainants a portion of the expense of the free pumpage of water, and decreed their rates should be reduced 18 per cent.; that is, from $1,172.64, as charged, to $961.57. From this decree, all parties appeal.

The questions involved in this record are new. Our attention has not been called to any case where the right to manage a water plant belonging to a city, in charge of a board of water commissioners, in the way this plant has been managed, has been challenged. The legislature created the board of water commissioners in 1853. After the original organization of the board, its members were appointed by the council. They were authorized, for the purpose of establishing a water plant, to borrow, upon the credit of the city, $250,000. The money was borrowed, and the city issued its bonds for that amount. The construction of the water plant was entered upon. In 1855 another loan of $250,000 was authorized, for extending and improving the works. A like amount was authorized for the same purpose in 1857, and again in 1869. In 1873 a loan of $1,000,000 was authorized. The original act (Act No. 90, Laws 1853) creating this board provided (section 9):

"Said commissioners shall, from time to time, cause to be assessed the water rate to be paid by the owner or occupant of each house or other building having or using water, upon such basis as they shall deem equitable; and such water rate shall become a continuing lien, until paid, upon such house or other building, and upon the lot or lots upon which such house or other building is situated."

Section 13 provides for a sinking fund from the surplus water rates or other sources to pay the interest and principal of the bonds issued for the money borrowed. The section in full is as follows:

"Whenever the receipts of said board, from water rates or other sources, shall accumulate so there shall be a surplus amounting to a sum of not less than five hundred

dollars, not needed for the payment of the current expenses or the extension of said works, it shall be the duty of the commissioners, together with the auditor of said city, who shall be associated with them for that purpose, to invest the same in some safe stocks, or upon other real or personal securities. Such investment shall be made in the name of said board, and in such manner as to make the same available for the payment of interest and principal of the bonds issued as aforesaid, as soon as may be. It shall be the duty of said commissioners to pay the interest on such bonds, and as fast as such surplus fund will permit; also the principal, as the bonds become due, as funds for such purpose shall from time to time accumulate. The said commissioners may, when they have funds for that purpose, purchase the bonds so issued as aforesaid, whether the same have become due or not; and in case the said commissioners shall at any time not have funds on hand sufficient to meet any of the said bonds at the time when they shall become due, they shall have the right to issue new bonds for such amount and on such time as they shall deem expedient, in the place of bonds so becoming due as aforesaid; the said old bonds to be canceled in the registry thereof, and the said new bonds to be recorded in the manner hereinbefore provided."

Section 24 provides for a water tax on the taxable property of the city for such sum annually as may be needed to meet any deficiency in the revenues of the board. The whole section reads:

"It shall be the duty of said commissioners, at least thirty days before the time fixed by the ordinance of said city for assessing city taxes, to make a special report to the common council of said city, what, if any, sum will be needed by said commissioners, over and above the revenue of said board, to meet the payment of interest or principal of the bonds issued as aforesaid, and it shall be the duty of the common council to raise said amount by special tax in the same manner as general taxes, to be designated a water tax; and the said amount shall be paid over to said board by the treasurer of said city."

The act of 1873 (Act No. 302) had this provision (section 2):

"It shall be the duty of the common council, and said

council is hereby empowered, to cause to be levied and assessed annually, upon the taxable property in said city, the sum of seventy-five thousand dollars, the same to be included in each annual tax assessment levied on said city, and the same shall not require or be conditioned upon the vote of the freemen of said city. The said sum shall be collected the same as other general taxes, and shall from time to time, as received, be paid over to said board by the treasurer of said city; and the moneys so paid over by said treasurer to said board shall be used and appropriated by said board, *first*, in payment of the interest of said bonds; *second*, if there be any surplus after payment of the interest accruing during the year, said moneys shall be paid into and form part of the sinking fund of said board, and used and appropriated to the payment of said bonds when due, or to the purchase of the same, or of any other of the bonds heretofore issued by said board, as the said board may, from time to time, think expedient."

It is evident from the reading of all these provisions it was thought, when the city paid, by direct tax, $75,000 a year, the plant would not only pay for its necessary extension and operating expenses, but would eventually pay for itself, even though the rates charged the water takers were reasonable and equitable. Ever since 1873 a levy of $75,000 each year has been made, and the proceeds of the levy paid over. It has not been necessary during that time for the water board, in order to meet its expenses, to ask for any further direct tax. It is now urged that the water ought to be furnished the users at its cost, and that the interest account, the extension account, and the cost of the plant should be borne by the property of the city. Is there any equity in this contention ? It is not an unusual thing for cities and villages to confer a franchise upon a private corporation to do what is being done by the board of water commissioners. The right to do this has never been questioned so far as we know, though the policy of doing it has often been questioned. Had this been done, would it be unreasonable for the private corporation to expect ultimately to get back from its patrons the cost of its investment, including its extensions, with a reasonable

profit?   If the legislature may confer upon the municipality the right to grant such a franchise, why may not that right be exercised by means of a board of water commissioners in the interests of the municipality, so the municipality shall ultimately own the property?   In the exercise of the franchise by a private corporation, the rates fixed must doubtless be reasonable and equitable. What more can be required of the rates fixed by the water board?

The record does not show the financial transactions for all the period covered by the existence of the board.   It does show, however, that from 1882 to 1895, inclusive, there was received from water rates $4,952,959.30.   During the same period there was paid by the city $1,036,-532.81.   It also shows there was paid of the bonds issued by the city $569,000.   The board of water commissioners has now existed nearly 45 years.   Bonds of the city issued for money expended upon the water plant for upwards of $1,000,000 are still unpaid.   These figures indicate very clearly the water board is making a very liberal rate to the water taker, and is not compelling this generation to pay all the expenses of the construction of the plant.   The record also shows, as will appear more fully later, the rates fixed are equitable and reasonable.

It has already appeared that the free use of water given is only to institutions in which the city and all its citizens are interested, and, where a partial rate is charged, the recipient is a charitable institution or an educational institution in the maintenance of which the public is more or less interested.   It is shown by the record that the making of the use of hose free was simply an adjustment of the rates, so as to make them more equitable; the user of the hose invariably being a water taker for other purposes, for which he paid according to the established rate, which was large enough to include the use of free hose without making the rate disproportionably low.   The rate charged the complainants since 1890, for the first 3,000 cubic feet, is two-thirds of a cent for each 100 gallons, and, for all

quantities over that amount, one-third of a cent for each 100 gallons. This is the same rate charged all users of water when the water passes through a meter, and, according to the testimony, it is approximately the same rate charged those whose premises are not metered. The board is very properly given wide discretion in the management of the water plant. *City of Detroit* v. *Board of Water Com'rs*, 108 Mich. 494 (31 L. R. A. 463). There is nothing in the record to show it has abused this discretion in fixing the rates. We think it is not accurate to speak of these water rates as taxes. All property except that which is exempt by law is subject to the payment of taxes, but the use of water is not compulsory. If the owner of property prefer to dig a well and construct a cistern instead of connecting with the system of waterworks, he, in most instances at least, would be at liberty to do so. It is true, if he is in the water district, he is entitled to the use of the water by complying with the regulations of the water board; it is also true these regulations must be reasonable; but it is not true they must be uniform, or that they must be based upon the value of the property where the water is used. "The water rates paid by consumers are in no sense taxes, but are nothing more than the price paid for water as a commodity, just as similar rates are payable to gas companies." *Jones* v. *Board of Water Com'rs*, 34 Mich. 273. It would be manifestly inequitable to require valuable premises, where from their character no water was used, to be charged with a water tax based upon values, while an adjoining piece of little value might, because of the character of its occupancy, use large quantities of water. When property has paid its proportion of the taxes growing out of fire protection and other uses in which property and the public in general have an interest, it has discharged its share of the burden.

The testimony discloses the water used by the fire department, the park commission, and for all other purposes which may be called "free water," for which property

should pay, constitutes but 4 per cent. of the entire pumpage. It also appears by the record that for years an assessment of $75,000 annually has been made upon the property of the city to apply upon the interest account and other expenses of the water plant. From 18 to 25 per cent. of the receipts of the water board have been derived from the city through a tax levied upon all of the property of the city. If any persons have a right to complain because the water rate paid by them is disproportionately larger, it is not the complainants.

The decree should be reversed, and the bill dismissed, with costs of both courts.

The other Justices concurred.