## Shirk *v.* Lancaster City, Appellant.

Argued May 23, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Joseph A. Beck,* with him *Wm. B. Arnold,* Assistant City Solicitor, and *H. Edgar Sherts,* City Solicitor, for appellant.

*F. Lyman Windolph,* of *Windolph & Mueller,* for appellee.

OPINION BY MR. JUSTICE KEPHART, November 27, 1933:

Lancaster, a city of the third class, owns its own water system supplying water to its citizens and, through water companies, to inhabitants of the suburbs. In 1931 the city decided to enlarge its plant and equipment by constructing additional storage facilities and a new and more efficient filtration plant; also to extend and improve its sewerage and drainage system by erecting a disposal plant, the latter pursuant to an order of the state department of health intended to prevent the use of the Conestoga Creek as an open sewer. Accordingly, after a report by its engineers and proper action by council, the electors authorized an increase of indebtedness in the sum of $3,250,000, to provide the moneys necessary to take care of both the water and sewerage systems. It was estimated that approximately $1,000,000 would complete the improvements to the former, the balance being necessary for the latter. It was decided by council that no new tax was to be levied to take care of the debt service charge resulting from this increase in debt, but provision was made in the ordinances for an issue of bonds to care for this charge through a lump sum to be taken from general taxes.

At the time the first million dollars was authorized by council, after the electors had voted in favor of the increase of debt, that body by ordinance created a new schedule of water rates repealing all former ordinances fixing rate schedules. The increase in rates ranged from 70% to 150% depending on the classification, or from a former gross total of $295,000 to an estimated gross return of $452,500. The actual billing for the first six months under the new rates was $239,000.

Appellee, a citizen and consumer, being dissatisfied with the rates, filed a bill charging the rates were unreasonable and asking the court below to enjoin their impo-

sition and collection. The question involved was whether the municipality could make a profit from its water business. The ascertainment of a proper rate base was ignored. After hearing, the court struck out certain items included in operating charges, disallowed any profit and as the rates reflected these items it decreed the rates unreasonable and restrained their collection by the city. As the decree left the city without any water rates, a supersedeas was allowed which is still in force.

Municipal corporations are creatures of the State, created, governed and abolished at its will. They are subordinate governmental agencies established for local convenience and in pursuance of public policy. The authority of the legislature over all their civil, political, or governmental powers is, in the nature of things, supreme, save as limited by the federal Constitution or that of the Commonwealth. As Justice MITCHELL, speaking for the court, said in Com. v. Moir, 199 Pa. 534, 541: "They have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence. This is the universal rule of constitutional law, and in no state has it been more clearly expressed and more uniformly applied than in Pennsylvania." [1]

---

[1] Phila. v. Fox, 64 Pa. 169, 180-1, SHARSWOOD, J., said: "The City of Philadelphia is a municipal corporation, that is, a public corporation created by the government for political purposes, and having subordinate and local powers of legislation...... It is merely an agency instituted by the sovereign for the purpose of carrying out in detail the objects of government, essentially a revocable agency, having no vested right to any of its powers or franchises, the charter or act of erection [creation?] being in no sense a contract with the State, and, therefore, fully subject to the control of the legislature who may enlarge or diminish its territorial extent or its functions, may change or modify its internal arrangements or destroy its very existence with the mere breath of arbitrary discretion...... The sovereign may continue its corporate existence and yet assume or resume the appointments of all its officers and agents into its own hands; for the power which can create and destroy can modify and change."

While the foregoing statement of the law is true with respect to the absolute control of the legislature in matters coming within the sphere of a municipality's governmental functions and possibly as to all property acquired by reason thereof,[2] the legislature's control of the property of a municipality acquired in its *proprietary* or *private character* is another question. These powers, in their nature unlimited, are not conferred primarily or chiefly from considerations connected with the government of the state at large, nor of the municipality, but for the private advantage, comfort and convenience of the compact community which is incorporated as a distinct legal personality or corporate individual. As to such powers, and to the property acquired thereunder, and contracts made with reference thereto, the corporation is to be regarded quo ad hoc as a private corporation, or at least not public in the sense that the power of the legislature over it or the rights represented by it is omnipotent; all its property of a distinctly private character is fully protected by the constitutional provision protecting private property of an individual or private corporation: New Orleans v. New Orleans Water Works, 142 U. S. 79; Dillon, Municipal Corporations (5th ed.), volume 1, section 109, page 182; McQuillin on Municipal Corporations (2d ed.), volume 1, section 238, 239.[3]

---

[2] "Where property is held by a municipal corporation purely as an agent of the State in the exercise of its governmental functions, such municipality only holds the title thereto as trustee for public and governmental purposes, and the State has the right, if it desires, to change the trustee, and may do so by transferring the property to another governmental agency for the same purpose, without compensation to the municipality and without imposing upon the new agency any obligation to pay debts incurred by the municipality in acquiring the property": Dillon on Municipal Corporations (5th ed.), volume 1, section 115, page 196.

[3] People v. The Common Council of Detroit, 28 Mich. 227, in a case involving a compulsory statute requiring the City of Detroit to erect fountains and improve and embellish a park for the recreation and enjoyment of its citizens, Cooley, J., states: "As to the property it thus holds for its own private purposes, a city is to be

The municipal corporation is regarded as trustee for the inhabitants of the territory embraced within its limits.

Though a municipality has no vested right in the powers conferred for governmental purposes, and the public moneys raised through such functions (taxes) are subject to the primary powers of the state to control and make appropriate provision therefor, revenues derived in its private capacity, as a return from its water or other utility works, are trust funds and cannot be controlled or taken directly for state purposes. See Board of Commrs. v. Lucas, 93 U. S. 108; People v. Ingersoll, 58 N. Y. 1; Cary Library v. Bliss, 151 Mass. 364, 25 N. E. 92. This is so even if such revenues were to be used for public purposes; they fall within the protection of the 14th Amendment.[4] They may be taxed as other similar receipts are taxed: Com. v. P. R. T. Co., 287 Pa. 70. The revenues of a municipality from the property thus owned in its private and proprietary character are for the beneficiaries.

Property employed by a municipality in furnishing

_____

regarded as a constituent in state government, and is entitled to the like protection in its property rights as any natural person who is also a constituent. The right of the State as regards such property, is a right of regulation, and though broader than exists in the case of individuals, is not a right of appropriation. The constitutional principle that no person shall be deprived of property without due process of law, applies to artificial persons as well as natural, and to municipal corporations in their private capacity, as well as to corporations for manufacturing and commercial purposes......

"Whoever insists upon the right of the State to interfere and control by compulsory legislation the action of the local constituency in matters exclusively of local concern, should be prepared to defend a like interference in the action of private corporations and of natural persons."

See Higginson v. Slattery, 212 Mass. 583, 99 N. E. 523.

[4] State v. Barker, 116 Iowa 96; Small v. Danville, 51 Me. 359; Higginson v. Slattery, supra; People v. Common Council of Detroit, supra; Helena Water Co. v. Steele, 20 Mont. 1, 49 Pac. 382; Western Savings Fund Society v. Phila., 31 Pa. 175; Montpelier v. East Montpelier, 27 Vt. 704; Town of Milwaukee v. City of Milwaukee, 12 Wis. 94.

water to its inhabitants is not used for governmental purposes, and in its ownership and operation the municipality acts in its proprietary character,[5] and as this court has already pointed out in The Western Savings Fund Society v. City of Phila., 31 Pa. 175, Ibid. 185, the power of the legislature in relation to the water works of a municipality is not "omnipotent." But the protection of Amendment 14 of the federal Constitution prohibiting the deprivation of property without due process of law, does not limit the authority of the legislature to regulate and control, through rates and allied subjects, this or other species of private property devoted to public use even though owned by a municipality. This power of control is inherent in the state in its soveregin capacity, exercised for the public welfare under its police power.

This power of regulation and control is exclusively a legislative matter.[6] Where a state constitutes a commis-

---

[5] Pub. Ser. Com. v. Helena, 52 Mont. 527, 159 Pac. 24, following Helena Consolidated Water Co. v. Steele, supra; Blades v. Detroit Water Commrs., 122 Mich. 366, 81 N. W. 271; Kenton Water Co. v. Covington, 156 Ky. 569, 576, 161 S. W. 988; Covington v. Com., 19 Ky. Law R. 105, 107, 39 S. W. 836. See State v. Andresen, 75 Ore. 509, 147 Pac. 526, 529; Russell v. Tacoma, 8 Wash. 156; West Bend v. West Bend Heating & Lighting Co., 186 Wis. 184, 202 N. W. 350. This principle has been adopted by this court: Am. Aniline Prod. v. Lock Haven, 288 Pa. 420; Central Iron & Steel Co. v. Hbg., 271 Pa. 340; Girard Life Ins. Co. v. Phila., 88 Pa. 393.

[6] "In Relief Elec. L., H. & P. Co.'s Petition, 63 Pa. Superior Ct. 1, 8 [it was said], 'The power to regulate and control belongs to the legislature and by it may be delegated to a commission,' citing Railroad Commission Cases, 116 U. S. 307, 336; Atlantic Coast Line v. North Carolina Corp. Comm., 206 U. S. 1, 19; Stanislaus Co. v. San Joaquin C. & I. Co., 192 U. S. 201, 207, 208": Com. v. Benn, 284 Pa. 421, 435. In .Terminal R. R. Assn. v. U. S., 266 U. S. 17, at 30, it is stated: "The making of rates is a legislative and not a judicial function: Keller v. Potomac Elec. Co., 261 U. S. 428, 440; Ohio Valley Co. v. Ben Avon Boro., 253 U. S. 287, 289 ......," but within a few lines it is recognized that the reasonableness of the rates fixed may be considered by the court after proper application to the commissioners has been made.

sion with general powers of regulation over utilities, it includes all such bodies, municipal or otherwise, unless there is definite classification and exemption therefrom. In this State, municipalities as a class are specifically exempted from the Public Service Act, with certain stated exceptions: Barnes Laundry Co. v. Pbg., 266 Pa. 24. See Springfield G. & E. Co. v. Springfield, 257 U. S. 66.

Municipally owned utilities, in the matter of rates and their regulation, are controlled by the courts under the Act of June 16, 1836, P. L. 1835-6, 785, 790, section 13. We held in Barnes Laundry Co. v. Pbg., supra,[7] that this act granted to the courts of common pleas broad chancery powers, and that the right of review of municipal water rates came within the jurisdiction of these courts. The right to originally fix rates of municipally owned plants is given to the municipality under some form of authority, and our power to regulate such rates or determine their reasonableness must come to us direct from the legislature; we cannot assume such power, though at common law redress could be had for unjust discrimi-

---

[7] The courts under the act have never attempted a review of an entire rate schedule of a municipality. When they do they become a fact finding administrative body at the same time exercising that "independent judgment" necessary in determining the question of confiscation under the 14th Amendment. We have passed on: May the municipality impose any water rates? (Jolly v. Monaca Boro., 216 Pa. 345); may it insist upon meter rates? (Consolidated Ice Co. v. Pbg., 274 Pa. 588); may it charge more outside than within its limits? (Youngman v. Erie Water Commrs., 267 Pa. 490); may it establish ready to serve charges? (Central Iron & Steel Co. v. Hbg., 271 Pa. 340); may it serve water to some and refuse it to others similarly situated? (Reigle v. Smith, 287 Pa. 30); may it agree to give free water to a manufacturing establishment? (American Aniline Prod. Co. v. Lock Haven, 288 Pa. 420.) See also Leechburg Boro. v. Water Works Co., 219 Pa. 263; Turtle Creek v. Penna. Water Co., 243 Pa. 401; Mechanicsburg Boro. v. G. & W. Co., 246 Pa. 232.

nation, overcharges and other similar matters.[8] No greater power is, or can be, given to the courts in the matter of the regulation of rates as to their reasonableness than the legislature itself possessed, nor can we, any more than the legislature, make orders contrary to the federal Constitution.

After considering all the cases and the enabling acts under which these water works are constructed, under what guise could the legislature or the courts prohibit a municipal water plant from making a profit? If the legislature or the courts could deprive a plant owned by the municipality of a fair return which includes a profit, they could prevent a privately owned water company from earning a profit or a fair return. Assuredly, the legislature, or a commission through them, has no such power and it could not prevent a municipality from earning a fair return. If it cannot, from what source do the courts get the power so to do unless they arrogate it to themselves or the enabling acts empowering the city to build or acquire such property limited their right to earn a profit? The limit of our power is (a) to prevent abuse in the exercise of the police powers by rate reviewing bodies, (b) not to abuse that power ourselves in reviewing rates of municipalities when the power of regulation is left to the court. We cannot abuse the power to regulate municipal rates so as to work confiscation of property or discrimination against users. We may, under the police power, for the public welfare, pursuant to the Act of 1836, restrict profits to a fair return or, in other words, bring profits through fair return within the

[8] Louisville & Nashville R. Co. v. Walker, 110 Ky. 961, 63 S. W. 20; McCallum v. Minneapolis, etc., R. Co., 129 Minn. 121, 151 N. W. 974; McGregor v. Erie Ry. Co., 35 N. J. L. 89; Lough v. Outerbridge, 143 N. Y. 271; Harmony v. Bingham, 12 N. Y. 99; Hardaway v. So. Ry. Co., 90 S. C. 475, 73 S. E. 1021; Parker v. Great Western Ry., 7 Man. & G. 253; Panton v. Duluth Gas & Water Co., 50 Minn. 175, 52 N. W. 527; St. Louis Brewing Assn. v. St. Louis, 140 Mo. 419, 37 S. W. 525; American Brewing Co. v. St. Louis, 187 Mo. 367, 86 S. W. 129.

zone of reasonableness. This is the function of courts and it must be left to the municipal authority to fix the rates which the municipality may receive, with the right of redress in the electorate-taxpayers if their managers do not act as they desire in the matter of profits.

The fundamentals of municipal ownership of a water plant are common convenience, efficiency, quality and low cost of the commodity to the consumer. Water, like air, is a necessity of life, and from a municipally owned plant, in theory at least, should come to the consumer without profit to the seller as such term is understood in the utility field, but such theory does not exclude the idea of profit, as we have recognized in our decisions: Rieker v. Lancaster, 7 Pa. Superior Ct. 149; Consol. Ice Co. v. Pbg., 274 Pa. 558, 562; Farnham on Water Rights, volume 1, section 162, page 855. This is generally conceded in other jurisdictions,[9] especially where, as in this case, the enabling act contains no limitation.

There are, of course, differences between a private water concern and a municipally owned water system in the matter of profits. These exist because of the difference in the character of ownership and of methods of financing. These are matters which concern the persons

[9] Wagner v. Rock Island, 146 Ill. 139, 21 L. R. A. 518, 34 N. E. 545; Preston v. Water Commrs., 117 Mich. 589, 76 N. W. 92; Twitchell v. Spokane, 55 Wash. 86, 104 Pac. 150, 24 L. R. A. N. S. 290; In re Sparta, 12 Wis. R. C. R. 532, 535-7; Re Kenosha, P. U. R. 1918 D. 751; Skogwo v. River Falls, P. U. R. 1917 E. 964; City of Cincinnati v. Roettinger, 105 Ohio St. 145, 137 N. E. 6; Alcorn v. Dickebach, 31 Ohio Appellate Reports 142, 28 Ohio L. Rep. 415; Re Bluffton, P. U. R. 1921 B. 716; Re Frankfort, P. U. R. 1920 C. 551; Apple v. Brazil, P. U. R. 1915 C. 561; Re Goshen, P. U. R. 1919 B. 525; Re Linton, P. U. R. 1921 E. 295; Booth v. Brookfield, P. U. R. 1917 D. 224. There are some contrary opinions, but most of them are based on statutes or deal with particular situations: Feil v. City of Coeur d'Alene, 23 Idaho 32, 129 Pac. 643, where the question was the constitutional limit of indebtedness; Uhler v. Olympia, 87 Wash. 1, 151 Pac. 117; Texas Electric and Ice Co. v. Vernon, 266 S. W. 600.

affected. In whatever light we may regard this ownership whether in the municipality as trustee for its taxable inhabitants or in such inhabitants, there can be no division of profits. Where a large amount of capital is necessary for a city water system, it must be raised by borrowed money, the repayment of which must be made in the first instance by the citizens through taxation. A privately owned water company, on the other hand, may dispose of its profits among its shareholders, and its plant is wholly responsible for its funded debt. In general, however, the business of supplying water by a municipality must be regarded and dealt with in the same manner as that of a private corporation. Should the supplying of water be determined to be a governmental function, inevitably there would follow endless confusion in the administration of the basic principles underlying the same business in the identical matter of rates, and also in other public and private relations which come before the courts.

In determining the amount of profit a municipality may receive, a rate base must be found. That base is the fair value of all the property used and useful in the business. It is only upon a fair value that the question of reasonable or oppressive rates can be determined. When the entire scheme of municipal water rates is under review by a court, it cannot tell whether the "acts" of the municipality are "contrary to law, prejudicial to the interests of the community or the rights of individuals" (Act of 1836), without a knowledge of the value of property involved. Under such review, the cost of operating the plant cannot be made the sole basis for rates as was done by the court below. Aside from profit, there are too many other elements that must be provided for in return, as, for illustration, depreciation, which cannot be provided for unless it is known what is to be depreciated. In supplying water to corporations and individuals outside the city, the applicable rates are subject to the jurisdiction of the public service commission though pre-

scribed by city ordinance; and the law requires the fair value standard to sustain such charges.

The determination of the fair value of a municipality's water system must be made in the same manner as that of a private corporation. See Ben Avon Boro. v. Ohio Valley Water Co., 68 Pa. Superior Ct. 561; also Ibid. 271 Pa. 346; and the vast number of cases since decided: Los Angeles G. & E. Corp. v. R. R. Comm., 289 U. S. 287.

The burden was on appellee to submit proof as to this value when challenging all municipal water rates as unreasonable in equitable proceedings; he failed to sustain the burden of proof. If the proceeding involved a privately owned utility before the public service commission, the effective date of an increase in rates determines where the burden of proof lies: Suburban Water Co. v. Oakmont Boro., 268 Pa. 243. There is no such rule in equity where rates are challenged as here. The court, however, may require the city to furnish to complainants' engineers a complete inventory of plant equipment, water mains, where the same is situated or located, its cost and all items entering into value. Taxpayers having an interest, similar in this regard to shareholders, may compel such disclosures where the charge is, as here, mismanagement.

The city did produce some evidence as to cost value, but it was not sufficient to permit finding a rate base or the fair value of the property. The running accounts submitted may contain many items of value which, through obsolescence, depreciation, or because no longer useful, should be eliminated. In determining any value, accrued depreciation should be deducted: Knoxville v. Knoxville Water Co., 212 U. S. 1, 10. In fixing the fair value of the entire property, the value of that part which may be allocated to service outside the city must be ascertained and deducted therefrom. While the public service commission has power to determine that value, where the commission has not acted on an application like the present one, the court hearing the case has power to as-

certain the value of the property used and useful in connection with the service outside the city, and may deduct such value from the value of the entire property. The balance remaining after this deduction will be the rate base for charges within the city.

Coincidently with determining the fair value of the property, the cost of operating the plant must be ascertained. It includes all charges or expenses involved in the production, supply and distribution of the commodity. This embraces among other items mentioned not only the salaries or wages of all persons employed directly by the city, but also a just portion of the salaries of elective officers whose time is engaged in that business. Such expenses as telephone, insurance, printing, stationery, etc., connected with supply and distribution must be given a place. All taxes, whether on the plant as such, or on any bonds that may be properly allocated as an indebtedness against the plant should be taken into consideration and allowed for. When this figure is ascertained in a given sum, a proportionate part of these expenses must be allocated to the business or service outside the city, and the balance must be provided for by rates within the city. A depreciation charge should also be provided for.

If this were a private water company and a sum sufficient had been found to cover operating expenses and contingencies, there would be allowed in addition *a fair return* on the present value of the property. It would be a lump sum representing a given percentage on the fair value. That is the fair return to investors. This fair return must take care of such items as interest and sinking fund on funded or other debts and dividends. No allowance in rates is specifically made for such items. It has happened, in cases before the public service commission, that the fair value may be less than the capital invested; indeed, sometimes less than its funded debt. These are occasioned through extravagant outlay or over capitalization. The public does not underwrite such ex-

travagance and rates cannot properly be based thereon or on the debt service necessary to meet it.

Fair return to a municipality should not exceed that allowed private concerns and may be less as the municipal authorities decide. If they determine not to make a profit or a profit less than ordinary, fair return may properly include consideration of such items as debt service charge to the extent the value of the property warrants. With this in mind, a return may be allowed which will compensate the city for any debt service charge on any funded debt, the money from which was used directly in building or improving the water system. This charge would include a portion of an allied indebtedness with which the water system is inseparably connected and which is necessary to the water system's successful operation though such indebtedness, in addition, has in fact been devoted to other uses such as a sewerage system. While under the Constitution such debt service charges are imposed directly on taxable property there is no reason why the municipal authorities cannot reimburse the general revenues for these expenditures by a fair return from the water system. In fact, section 15, of article IX, of the Constitution, seems to contemplate such steps. This places the paying burden where it belongs. A certain portion of this debt service should be allocated to that portion of the plant used and useful for outside consumers.

The difficulty arising from fixing a return in excess of these items does not come from its receipt, but its administration or disbursement. No difficulty would arise if the consumers and the use of the commodity bore an equitable relation to the taxpayers and the value of their property since such profits might then be equally distributed in the payment of governmental expenses generally. But the price for the use of water depends, as it should, on the quantity used. It is easily conceivable that profits may be used so as to work gross discrimination or preference among taxable inhabitants. For illustration:

The City of "X," with 10,000 population, owns its own water system from which it has a profit of $50,000 yearly. The annual budget for the city's governmental expenses is $150,000, of which $100,000 is raised by taxation, the balance paid by the profit realized from its water consumers, inhabitants and taxpayers. Among its taxable inhabitants is a corporation which is assessed with nine-tenths of the total value of property within the city. It has its own water supply, is not a consumer, nor is it in any other way burdened for anything on account of the water system. It is manifest that the use of these profits to pay the balance of the city's governmental expenses, is equivalent to a gift to this company since ordinarily it would be required to make up part of the governmental expense by a tax. While the illustration is broad, it may be reduced to smaller units, and we merely mention it to emphasize what is to follow. Water rates are simply charges for a commodity sold as any others sell commodities: Barnes Laundry Co. v. Pbg., supra. They are not a substitute for taxes.

While it is our considered judgment that this court does not have the power to deprive a municipality from making a profit in its water business, we can lay down some rules with regard to the use of the profits. The city should not make profits the basis for manifestly unreasonable discrimination or preference in the tax burdens. In this connection the use of the profits from service outside the city is within the control of the authorities and may be used generally for any purpose. Ordinarily the purpose for which any profits are used is within the sound discretion of the municipal authorities, and this discretion will not be interfered with unless it is abused.

When that question is considered, courts will be confronted with the analogous problem that always arises in connection with municipal endeavors or municipal improvements. In all of these endeavors, some discriminations and some preferences must be made against one portion of the community for the apparent sole benefit

of another. Take for illustration the paving of highways. While the property owners adjoining the highway pay a certain portion of its cost, the taxable property of the city as a whole is made to bear a part of that burden. This is on the theory that there is a general benefit, but, it does not obviate the fact that the great benefit comes to the property owners immediately adjoining the improved street. It is clearly within reason that the particular street paved may never be used or scarcely ever used by the property owners in a distant part of the city. This is within the necessary theory of government. These benefits cannot always be worked out equally, and so in the use of profit from the supply of water, unless manifest injustice is shown, courts will not interfere. Municipal authorities, if they determine to make a profit, and that matter is solely within their control, should bear in mind that municipal ownership implies the furnishing of water at the lowest cost possible, consistent with efficiency, service, quality of the commodity and the preservation of the plant; and profits should not be used to create manifest preference or discrimination among other taxpayers. We leave this admonition with the municipal authorities, noting again that the power of this court comes only through the regulation of the rates.

We summarize from the record as follows: (a) The present fair value of the entire plant should be ascertained and that part used or useful in service outside the city deducted.

(b) A sum should be ascertained to cover operating expenses and contingencies; there should be deducted from it that portion necessary for service outside the city.

(c) A depreciation charge should be set up.

(d) It must then be ascertained whether the rates as fixed after allowing for (b) and (c) yield more than the fair return permitted on the present value of the plant to incorporated water companies as fixed by the public

service commission and this court (see Ben Avon Boro. v. Ohio Valley Water Co., supra). If it does, the amount of return allowable should be stated, and the city should be directed to adopt a schedule of rates within that sum and items (b) and (c).

(e) Debt service charges, as discussed, may be compensated from such return.

(f) Governmental expenses may be paid from the residue unless it manifestly prejudices a portion of the taxpayers.

The decree of the court below is reversed, and the record is remitted with directions to proceed in accordance with this opinion.