In the Matter of the Application of the VILLAGE OF BOONVILLE, NEW YORK, Petitioner, for a Certiorari Order against MILO R. MALTBIE and Others, Constituting the Public Service Commission of the State of New York, and Another, Defendants.*

Supreme Court, Albany County, June 24, 1935.

*Andrews, Andrews & McBride* [*Edward T. Fennell* of counsel], for the petitioner.

*Charles C. Blakeslee*, for the defendants.

SCHENCK, J. Petitioner, Village of Boonville, seeks an order staying and suspending, pending the final determination of a review by the Appellate Division, the execution and enforcement of the order of the Public Service Commission dated March 27, 1935, requiring petitioner to file a new schedule of rates for electric service.

The village of Boonville owns and operates its own electric lighting system under the management of a board of light commissioners, furnishing electric current within the said village and

---

* See, also, 245 App. Div. 468.

in five towns adjoining and outside of the village limits. Since the operation of this municipal plant, which began in 1904, the bonds which were issued to begin the original construction have been retired from the profits from the sale of electricity, all plant extensions have been constructed from such profits, and the books of the village show a surplus of nearly $250,000. In each of the past two years there has been turned over to the general village fund $5,000, resulting from the operation of this plant.

The real issue here to be determined is whether or not the village of Boonville should be required to operate its electric plant at bare operating costs without any return upon its property used and useful in the public service. In other words, may a municipality owning an electric plant operate such plant at a profit? It is conceded that the reduction in rates ordered by the Commission will reduce the annual revenues of the municipal plant in a sum not to exceed $10,000 within the village, and $5,000 in the towns outside of the village which are now supplied by such operation.

The petition for an order of certiorari and the affidavits accompanying the order to show cause for a stay of the enforcement of the Commission's order fixing temporary rates indicate that it is the ruling of the Commission that a municipally owned electric plant must be operated at operating costs without any return of profit and that the Commission has refused to determine the fixed capital or plant value and prescribe rates that will allow a fair return thereon. Petitioner contends that the Commission in fixing rates must consider original costs, production costs, present reasonable value of petitioner's property, and after making proper allowance for depreciation reserve and for replacements, prescribe such rates as will produce a fair return upon the property used and useful in the public service, consideration being given to all of the elements required to be considered in arriving at a rate base for a privately owned electric utility.

The defendants here, constituting the Public Service Commission, contend that in fixing rates the Commission may make different regulations for municipally owned utilities as distinguished from those privately owned, and assert that the State, acting through the Commission, may limit the rates and charges of municipally owned utilities to those which would be sufficient to provide the proper outlays and expense of operation, without regard to any return upon the value of the property used in the public service, on the theory that a municipal electric plant is public property of the municipality.

That the Commission in arriving at the schedule of rates to be charged has allowed for complete operating expenses, including all

costs directly attributable to the rendition of service, is not seriously disputed. It has also made allowance for the creation of a reserve for uncollectible bills, allowance for taxes, including the amount which the village claims would be paid if the plant were, in fact, operated by a private corporation, and for all supplies and office space furnished by the village. No allowance has been made, however, for a return on the plant property, the Commission maintaining that the profit motive should not enter into the consideration in a rate-making proceeding on the ground that it is against public policy to accumulate profits from the operation of municipal plants over and above all costs and considerable reserves in order that such profits may be transferred to the village funds and used to reduce taxes or promote municipal projects.

Apparently the question as to whether a municipally owned utility is entitled to receive a return upon its property used and useful in the public service has never been adjudicated by the courts of this State. Courts of other jurisdictions, however, have passed upon this question and those decisions may in some measure be considered in the determination of the issues here raised.

A municipal corporation is the creature of the State and is subject to the authority of the Legislature over all of its civil, political or governmental powers, except in so far as that authority is limited by the Federal or the State Constitution. It acts in its governmental capacity as an agency for the better government of those residing within its limits, and when acting in a private or quasi-private capacity, it exercises powers and privileges for its own benefit. It has no inherent rate-making powers, rate regulation being a matter of the police power of the State. (*Matter of Niagara, Lockport & O. P. Co.* v. *Prendergast,* 229 App. Div. 295; *People ex rel. Village of South Glens Falls* v. *Public Service Commission,* 225 N. Y. 216.) A municipality which operates an electric plant in its proprietary capacity operates it as a private enterprise subject to the same liabilities, limitations and regulations as privately owned utilities and is subject to rate regulation of the Public Service Commission in a like manner. The right to operate an electric plant is given the municipality by the Legislature, and while the State, acting through the Public Service Commission, may determine the reasonableness of the rates to be charged consumers, the municipality is entitled to the same protection of the provisions of the Fourteenth Amendment of the Federal Constitution as any privately owned utility. It may not lawfully be deprived of a fair return on the value of its plant property any more than a privately owned utility may be prevented from earning a reasonable profit. To hold that the Public Service Commission may so regulate the rates of a

municipally owned plant as to prevent a fair return on the property used and useful in the public service would amount to confiscation.

In *Shirk* v. *Lancaster City* (313 Penn. St. 158; 169 A. 557) the court in passing upon the question as to whether or not a municipally owned water plant could operate at a profit, held that property employed by a municipality in furnishing water to its inhabitants is not used for governmental purposes but that in its ownership and operation the municipality acts in its proprietary character and that the Legislature could not prevent the municipality from earning a fair return. The court in its opinion says: " After considering all the cases and the enabling acts under which these waterworks are constructed, under what guise could the legislature or the courts prohibit a municipal water plant from making a profit? If the legislature or the courts could deprive a plant owned by the municipality of a fair return which includes a profit, they could prevent a privately owned water company from earning a profit or a fair return. Assuredly, the legislature, or a commission through them, has no such power, and it could not prevent a municipality from earning a fair return. If it cannot, from what source do the courts get the power so to do unless they arrogate it to themselves or the enabling acts empowering the city to build or acquire such property limited their right to earn a profit? The limit of our power is (a) to prevent abuse in the exercise of the police powers by rate reviewing bodies, (b) not to abuse that power ourselves in reviewing rates of municipalities when the power of regulation is left to the court. We cannot abuse the power to regulate municipal rates so as to work confiscation of property or discrimination against users. We may, under the police power, for the public welfare, pursuant to the act of 1836, restrict profits to a fair return or, in other words, bring profits through fair return within the zone of reasonableness."

The money for the original construction of the Boonville plant was necessarily raised in the first instance upon the credit of the taxpayers of the village. If a loss had occurred, the taxpayer would be called upon to sustain such loss. If that be so, is there any logical reason why in the event of a profit that such profit should not be used for proper municipal purposes, thereby relieving, to some extent at least, the burden of taxation? The advancement of a proposition that in the event of a deficit the taxpayer must make good the loss, but in the event of a profit he shall not be allowed to share therein, does not commend itself to me. No one will maintain that the operation of a municipal electric plant is a governmental function for no one is required to accept electric service unless he so desires. A taxpayer has an interest in a municipal plant similar to that of

the shareholders in a plant owned by a private corporation and it would seem that the business of supplying electricity by a municipality to its consumers should be dealt with in the same manner as that of any private corporation and the cost of operating the plant cannot be made the sole basis for rates.

As pointed out in *Shirk* v. *Lancaster City* (*supra*), the determination of the fair value of a municipal plant must be made in the same manner as that of a private corporation and after a sum sufficient to cover the operating expenses and contingencies has been found there should be allowed in addition a fair return on the value of the property.

In *City of Logansport* v. *Public Service Commission of Indiana* (202 Ind. 523; 177 N. E. 249) the court squarely held that a municipally owned utility is entitled to receive a fair return by way of interest upon an investment, the same as a privately owned utility, and the matter of earning such return or not is one of policy for the municipal authorities. It may be that a municipality will be satisfied with less return than would be fair to a private corporation, due to its ability to borrow money at a lower rate of interest and its willingness to forego profit, but if it so desires, it is entitled to earn a return upon its investment commensurate with that which would be reasonable in the case of a private corporation. (*Cavanaugh* v. *Whitefish Municipal Water Utility*, P. U. R. 1922-E, 209.)

In *Wagner* v. *City of Rock Island* (146 Ill. 139; 34 N. E. 545) it was held that a municipal corporation which supplies its inhabitants with gas or water does so in its capacity of a private corporation and not in the exercise of its powers of local sovereignty, and where such power is granted to a city it is a special private franchise made as well for the private emolument advantage of the city as for the public good. Substantially the same rule is laid down in *Preston* v. *Water Commissioners* (117 Mich. 589; 76 N. W. 92). Again, in *Springfield Gas & Electric Co.* v. *City of Springfield* (292 Ill. 236; 126 N. E. 739), the court held that a municipally owned utility may make reasonable rates and charges and operate its plant at a profit.

In *Matter of Rapid Transit R. R. Comrs.* (197 N. Y. 81) one of the questions submitted was whether the city of New York in building its subway acted in a governmental or proprietary character. Judge VANN, writing the opinion for the court, points out that the construction and operation of the subway is a private enterprise carried on by the city in which losses may occur and profits result, and says (at p. 96): " The city owns the subway, and it is a railroad corporation so far as the construction, operation and leasing thereof is concerned. It was not required, but simply

permitted, to build and operate the road. It is authorized to lease its railroad, either for ' a specified sum of money or a specified proportion of income, earnings or profits;' or it may operate the road itself and charge such rates of fare for the transportation of persons and property as may be fixed by its own boards and officers. (L. 1909, ch. 498, §§ 27 and 30.) In other words, the subway is a business enterprise of the city, through which money may be made or lost, the same as if it were owned by an ordinary railroad corporation. It was built by and belongs to the city as a proprietor, not as a sovereign. (*Maxmilian* v. *Mayor, etc., of N. Y.*, 62 N. Y. 160; *Missano* v. *Mayor, etc., of N. Y.*, 160 id. 123; *South Carolina* v. *United States*, 199 U. S. 437.) "

The rule laid down in *Matter of Rapid Transit R. R. Comrs.* was followed in *N. Y. & Queens Electric Light & Power Co.* v. *City of New York* (221 App. Div. 544).

The trend of decisions in other jurisdictions clearly indicates that a municipality operating a utility in its private or quasi-private capacity is entitled to the same consideration as a privately owned utility and, of course, is entitled to the same constitutional protection.

I am not unmindful of the fact that the anticipation of lower service charges by the citizens of a municipality is generally the incentive for the construction and operation of a municipal plant, but this, in itself, is not controlling. If the operation of a municipal plant at reasonable rates produces a profit, may it be held that such profit should not be used to lessen the burden of taxation? The money derived from such operation is safeguarded by the laws of this State and may be used only for specified purposes, and acquiring funds from such source does not constitute taxation.

In the exercise of sound discretion this court may grant an order staying the enforcement of an order of the Public Service Commission when evidence has been submitted to it that great and irreparable damage would otherwise result to the petitioner, which order shall contain a specific finding based upon such evidence and identified by reference thereto, and specifying the nature of the damage. Clearly, great and irreparable damage would result to the petitioner in the event that the Appellate Division sustains petitioner's contention that it is entitled to a fair return upon its electric plant. It is conceded that by such order it will suffer a loss in the form of reduced revenue by not to exceed $15,000 annually. Whatever loss in revenue is sustained in all probability could never be wholly recovered.

Order may be entered granting the application of the petitioner herein for a stay upon condition that this petitioner file a bond in a

sum and in form to be approved by this court conditioned to secure its customers a refund, with interest, of any excess charges ultimately found to have been collected by it during the period of this stay, which shall be limited to twenty days after the determination of the Appellate Division of the review herein under the order of certiorari.