## Rankin, Appellant, *v.* Chester Municipal Authority.

440

Argued July 15, 1949. Before Rhodes, P. J., Hirt, Reno, Dithrich, Ross, Arnold and Fine, JJ.

*Ralph S. Croskey,* with him *Croskey & Edwards,* for appellant.

*J. H. Ward Hinkson,* for appellee.

Per Curiam, July 25, 1949:

Decree affirmed; each party to pay his or its own costs; opinion will be filed later.

OPINION BY FINE, J., September 27, 1949:

James L. Rankin, appellant, on the 31st day of December, 1948, filed his bill in equity against Chester Municipal Authority, appellee, to secure an injunction restraining the Authority from collecting water rates in excess of those in effect between January 1 and October 31, 1946; requiring the Authority to refund water rates collected since November 1, 1946, in excess of the aforesaid rates; restraining appellee from putting into effect proposed increased rates to become effective January 1, 1949, on the ground that the increased rates are unreasonable and excessive; and directing that certain surplus funds placed in the Authority's "debt service fund" be employed in the financing of certain improvements presently being effected by the Authority. The challenged rates are said to be unreasonable, excessive and unwarranted for the reason that surplus funds in the debt service fund are above the reasonable requirements of the outstanding bonds of the Authority and said surplus, if properly applied, would be sufficient to finance in part some of the improvements.

The Authority filed preliminary objections to the bill asserting that it (1) failed to show the increased rates are unreasonable and excessive; (2) failed to demonstrate that the Authority possesses power or authority to deal with surplus in the debt service fund as alleged in the bill; and (3) reveals on its face that appellant is guilty of laches. The court below dismissed the preliminary objections and directed that an answer be filed and that the matter proceed to hearing on the issue of the reasonableness of the increased rates. The answer admitted all material averments of the bill. The Authority asserted, however, by way of defense and in justification of the increased rates that in 1946 it had committed itself to provide pure water for the City

of Chester by securing a new source of water supply,[1] then estimated to entail an expenditure of almost $10,000,000; that such project was already under construction with hopes of completion in 1950 or 1951; and, that the water rates were successively increased in 1946 and 1949 exclusively for the purpose of establishing an earning capacity required under the terms of an agreement with its bondholders before it could borrow the necessary funds to complete the project already begun. A hearing was held after which the chancellor entered a decree nisi dismissing the bill. Appellant's exceptions thereto were overruled by the court en banc and the bill was dismissed. Thereafter, the Authority advertised its proposed issue and sale of $5,740,000 of water revenue bonds for May 5, 1949, and solicited bids therefor. Ten days prior thereto, on April 25, 1949, appellant perfected the present appeal and as a result no bids were received.

Two basic questions are presented for determination: (1) Is the subject matter of this controversy within the jurisdiction of a court of common pleas? It is conceded that the Authority has instituted no proceedings before the Pennsylvania Public Utility Commission. It is also true that appellant has not sought to invoke jurisdiction of the Commission. (2) May a municipal authority increase its service rates to establish for a limited period an earning capacity, adequate under the restrictive provisions of an agreement with its bondholders, to finance improvements currently in the course of construction and urgently required in the public interest?

---

[1] The Delaware River now constitutes the Authority's sole source of supply. Because of the highly polluted condition of the river and the saline content thereof, many industries are moving out of the area creating an economic problem which the Authority is seeking to remedy.

We are all agreed that the court of common pleas has exclusive jurisdiction to inquire into the reasonableness of rates charged by a municipal authority beyond as well as within the corporate limits of the municipality which created it. Section 301 of the Public Utility Law (Act of May 28, 1937, P. L. 1053, as amended, 66 PS §1141), provides: "Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission: Provided, That only public utility service being furnished or rendered by a *municipal corporation, or by the operating agencies of any municipal corporation,* beyond its corporate limits, shall be subject to regulation and control by the commission as to rates, with the same force, and in like manner, as if such service were rendered by a public utility." Prior to the enactment of the Public Utility Law, supra, it was held that while jurisdiction over water rates charged by a municipality, within its corporate limits, was vested in the court of common pleas, the "Public Service Commission" was the tribunal vested with jurisdiction over rates charged beyond the municipal boundaries. *Shirk v. Lancaster City,* 313 Pa. 158, 166, 169 A. 557. Subsequent to the enactment of the Public Utility Law and the amendment of §301 thereof, supra, this Court held in *State College Borough Authority v. Pennsylvania Public Utility Commission,* 152 Pa. Superior Ct. 363, 31 A. 2d 557, that the Public Utility Commission was vested with jurisdiction regarding a controversy involving reasonableness of rates charged by a municipal authority to consumers residing outside the municipality which created the authority. Cf. *Ambridge Borough v. Pennsylvania Public Utility Commission,* 137 Pa. Superior Ct. 50, 8 A. 2d 429. Subsequent thereto, the legislature enacted the Municipality Authorities Act of 1945 (Act of May 2, 1945, P. L. 382, et sec. 53 PS §2900z-1 et sec.)

to negative the effect of *State College Borough v. Pennsylvania Public Utility Commission,* supra. Section 4 of this Act, 53 PS §2900z-5(h), provides: ". . . The court of common pleas shall have exclusive jurisdiction to determine the reasonableness and uniformity of rates and other charges fixed, altered, charged or collected by an Authority." It is true that the legislature has not by specific amendment of the Public Utility Law either removed municipal authorities from the definition of "municipal corporation" as contained in the Public Utility Law (Section 2[15] Act of 1937, P. L. 1053, Art. I, §2, 66 PS §1102[15]) or delimited the scope of its jurisdiction and power (Section 301 of the Public Utility Law, supra, 66 PS §1141). It is apparent, however, that §4B(h) of the Municipality Authorities Act of 1945, supra, is wholly inconsistent with the above mentioned sections of the Public Utility Law.

The principle is well established that where, as here, there is a positive repugnancy between provisions of separate laws enacted at different sessions of the legislature, the earlier provision is impliedly repealed. Section 66 of the Statutory Construction Act of 1937, P. L. 1019, 46 PS §566, provides: "Whenever the provisions of two or more laws passed at different sessions of the Legislature are irreconcilable, the law latest in date of final enactment shall prevail." General, independent, substitute or separate legislation, complete in itself, may have an amendatory effect upon other and uncited statutes by implication or indirection without violating Article III, §6 of the Constitution whch provides: "No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length": *Wilkes-Barre v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 210, 63 A. 2d 452. Both by actual intendment and construction, it appears

abundantly clear there was a definite limitation imposed upon the operation and effect of §301 of the Public Utility Law by the Municipality Authorities Act of 1945, whereby the determination of issues involving reasonableness of rates beyond the corporate limits of the municipality creating the Authority—as well as within—now lies exclusively with the court of common pleas.

The issues involved in the remaining controversy, i. e., the necessity to finance improvements within the limitations specified by the agreement between the Authority and its bondholders, require a recital of the following facts: The Chester Municipal Authority was created on December 8, 1939, under the Municipality Authorities Act of June 28, 1935, P. L. 463, when it purchased the properties and franchises of the Chester Water Service Company. The Authority possessed no taxing power. It could not pledge its assets to secure a loan; it could offer to prospective bondholders only the security of future net revenues. To finance this purchase, the Authority issued water revenue bonds in the amount of $5,910,000, and entered into certain covenants with the bond holders, which are embodied in a resolution dated December 8, 1939, hereinafter referred to as the "Indenture." The pertinent provisions of this Indenture which confronted the Authority when it came to finance the new water project are summarized in a footnote.[2]

---

[2] In Article II, §3 of the Indenture it is covenanted that the Authority shall dispose of no additional bonds on a parity with the original issue unless, during each of the two calendar years preceding the issuance of such additional bonds, payments into the Debt Service Fund have equaled at least 120% of the sum of the following: (1) Debt service requirements (principal and interest) on all bonds actually outstanding at the time, and (2) An amount equivalent to what the interest and amortization charges on the proposed issue of additional bonds would have been if they had then been outstanding.

In Article V, §3 it is covenanted that all revenues received by the Authority, while any of its original bonds are outstanding—and none of the bonds may be called for payment—are to be dealt with as

Management of the Authority, responding to compelling reasons and to insistent demands, deemed it imperative in the public interest that a new source of water supply be secured and proceeded with meticulous care to provide for the pressing needs of the consumers. On December 31, 1946, after exhaustive engineering studies, the Authority purchased, as a nucleus of the proposed improvements, modest impounding facilities, a small pumping station and the pertinent water rights, in Pine Grove, on the Octoraro Creek, Chester County, from the Pennsylvania Railroad for $233,000. This location, forty miles distant from the City of Chester, was deemed to be the best and most practical new source of supply. The planned new facilities consist of a dam, spill way, and a two billion gallon reservoir on the Octoraro Creek, a filtering plant and pumping station at Pine Grove and a large transmission main to carry the water to Chester. Consulting engineers originally estimated the cost for the entire project at $9,469,000 as of November 1, 1946. That figure had to be revised upward as of November, 1948, to $13,939,794 because of increased labor and material costs. At the time construction was begun in 1946, the Authority, by reason

---

follows: (1) There shall be paid into an Operation and Maintenance Fund moneys to defray the reasonable expenses of operation and maintenance. (2) There shall be paid monthly into a Renewal and Replacement Fund an amount equal to 1/24 of one percent of all bonds theretofore issued, to cover the cost of major repairs, renewals and replacements. (3) The entire balance of the revenues shall be paid into a Debt Service Fund; and the moneys deposited in such Fund shall be held in the name of the Authority, in trust, and shall be used solely for the following purposes, and no other: (a) to pay principal and interest on outstanding bonds as the same become due; (b) to repurchase the Authority's bonds in the open market with any excess funds, of and when bonds become available — provided such bonds bear a maturity not less than two years from the date of such purchase; (c) to invest excess funds in direct obligations of the United States, if bonds of the Authority can not be reacquired at reasonable prices.

of restrictive clauses of the Indenture of 1939, had a limited borrowing capacity which was utilized by the issuance of additional water revenue bonds in the amount of $3,670,000. These funds have been applied toward the construction of the dams, spill ways, filtering system and pumps and will be exhausted prior to the completion of the improvements. Further, no money is presently available with which to enable the Authority to construct the transmission main to Chester at an estimated cost of $6,500,000, or to construct the reservoir system at Oxford, Village Green and Harrison's Hill, en route to Chester, at an estimated cost of $850,000, or to defray the cost of other improvements detailed in the engineers' estimates. With the exclusive purpose of completing these improvements the Authority, on November 1, 1946, upon advice of its consulting engineers, increased its rates 51% and on January 1, 1949, again increased its rates 28%, due, as heretofore stated, to the increased costs of labor and materials, in order to provide prospective revenues necessitated by the Indenture to establish a total borrowing capacity of approximately $10,300,000. The appellant now challenges the two successive rate increases as unreasonable and excessive, although one of these increases has been operative for twenty-six months. There is no suggestion nor hint that this project is unreasonable, ill-conceived or extravagantly planned. Nor is there any charge of waste or mismanagement. That the project is an extreme necessity may be gathered from significant comment of the learned chancellor to the effect that "Chester faces economic eclipse, unless a new water supply is procured." The only present alternative to the Authority's action would be the abandonment of necessary improvements until the original issue of bonds has been paid off thirty years hence, entailing probable loss of approximately four millions of invested capital and serious economic losses to industrial consumers, as well as

other conceivable harm to the Authority and to the communities serviced by it.

Appellant lodges objection to the Authority's administration of its debt service, pursuant to the restrictive covenants of the 1939 Indenture, and in substance asks that the rates be declared unreasonable because a surplus of $2,787,890.24 as of December 31, 1948, earmarked for debt service retirement, should not be maintained, but instead should be employed to defray in part the costs of the new construction. To sustain this contention, would require this Court to disregard completely the rights of bondholders and impair the obligations of lawful and valid contracts. Indeed, the appellant does not attempt to attack or challenge the validity of the mandatory provisions of the Indenture at this late date. He conveniently ignores them and would have us do likewise. The court below very pertinently said: ". . . [the Authority] may not be ordered to use the funds in the Debt Service Fund, except as permitted by the Bond Resolution of December 8th, 1939. To do so would mean that (1) we compel the [Authority] to break faith, after ten years, with its bondholders; (2) we take from the Authority any possible chance of further financing; (3) we compel the Authority to cease construction of the new water supply and thereby deprive the water users from a much needed new supply of water."

Section 4B(h) of the Municipality Authorities Act of 1945, supra, requires the Authority to determine its rates for the purpose of providing: (1) for the payment of expenses of the Authority; (2) for the *construction, improvement,* maintenance and operation of its facilities; (3) for payment of principal and interest on its obligations; and (4) *for fulfillment of the terms and provisions of any agreements made with bondholders.* The Act further requires that the rates established be "reasonable and uniform." This cardinal rule must

respect the necessities of the situation created by the foregoing factors. The appellee is not an ordinary public utility and differences must be observed in the regulation of its rates: *State College Borough Authority v. Pennsylvania Public Utility Commission,* 152 Pa. Superior Ct. 363, 31 A. 2d 557. The present rate schedules were adopted by the Authority under the express power to fix rates for the purpose of providing for the "construction and improvement" of required facilities, consistent, however, with its covenant "to fulfill the terms . . . of any agreements . . . with . . . holders of any . . . obligations." Aided by reliable computations of experts of recognized competence, which were made in accordance with conservative and approved practices, the board members of the Authority fixed the rates in the exercise of their best judgment and sound discretion. Moreover, no convincing evidence appears in the record to seriously challenge from any approach the reasonableness of the rate structure. No attempt was made by appellant to show the fair value of the water system. The rate schedules, after the increases, have not been shown to be generally higher than those of other water companies in immediately adjacent areas with the sanction of the Public Utility Commission. Judge SWENEY aptly said for the court en banc: "It is apparent, . . . that single and alone the plaintiff persists in his efforts to embarrass the defendant. This whole matter can best be settled by permitting the defendant to complete the new water supply system; to issue bonds as needed, both as serial bonds and term bonds, to use surpluses in the Debt Service Fund, so as not to invalidate the Bond Ordinance, to the end that Bondholders will be amply protected, bonds will be paid as soon as legally possible and water rates will be reduced without injury to the financial structure of the Authority."

Appellant, upon whom rested the burden of proof (*Shirk v. Lancaster City,* 313 Pa. 158, 169 A. 557) has

not in any way shown that the increased rates produce an unreasonable return, but seeks solely to have the court compel the Authority to divert revenue, which by its obligations. with the bondholders it has covenanted to be placed in a special debt service fund. The court below properly concluded that the rates were absolutely necessary for the completion of the water supply project now under construction in Chester County, and in the circumstances reasonable.

The appellant also complains that the present water users are contributing more than their fair share of the cost of the new water supply and that the higher rate schedules are in effect an imposition of taxes pursuant to an improper and unlawful delegation of power to the Authority. While to a limited extent the present water users may temporarily be called upon to accept higher rates, the situation is of their own choice, in their own interest, and as a result of their insistent demands for a better water supply. The contributions of the present users in excess of the payments by future users are problematical, but in any event they will be quite small, reasonable and proportionate. Moreover, those who use the water facilities over a period of forty years (spread of construction bond maturities) will of course contribute their fair and proportionate share of the improvements costs. In securing benefits and improvements of this and like nature, some discrimination and some preferences may be made; they cannot be measured with mathematical exactness. If there is no manifest injustice, unreasonable discrimination or undue preference—and none has been here shown—the courts will not interfere.

The higher rate schedules temporarily offered to present water consumers are not violative of Article IX, §1 of the State Constitution nor of the equal protection and due process clauses of the Fourteenth Amendment

to the Federal Constitution. They are not general taxes for general improvements nor a special assessment for local improvements; they simply represent valid and reasonable charges for a commodity sold. They are not substitutes for taxes; the schedules are formulæ of charges for industrial services and rest upon a contract rather than taxing power, since only those who voluntarily benefit and impliedly agree to pay are charged for the product furnished or for the services rendered.[3] The Municipality Authorities Act of 1945 does not unlawfully delegate the power to tax in violation of Article III, §20 of the State Constitution.

The statute merely enables the Authority to prescribe "reasonable and uniform" rates subject to the definite limitation of complete regulation by the common pleas courts. The increased rates have not been shown to be disproportionate to the necessities of the situation nor to the additional services to be rendered. The good faith of the appellee is not questioned. The increase of rates for the purpose of providing an urgently needed new source of pure water can no more be considered a tax than any increase in price of a commodity or of services rendered by any public utility.

The appellant does not argue that the option granted to the Pennsylvania Railroad Company by the Authority, with approval of the Public Utility Commission, as part consideration for the purchase of the railroad's water facilities, is material to the issue of reasonableness of the water rates and hence it need not be here discussed.

For the reasons given, the order entered July 25, 1949, affirming the decree appealed from, is confirmed. Each party to pay his or its own costs.

---

[3] *Manheim Township Supervisors v. Workman*, 350 Pa. 168, 38 A. 2d 273; *Barnes Laundry Co. v. Pittsburgh*, 266 Pa. 24, 109 A. 535.