Monaghan et al. v. City of Philadelphia et al.

*H. N. Schwartz* and *J. W. McWilliams,* for plaintiffs.

*A. L. Freedman, R. M. Landis* and *K. I. Schofield,* for defendants.

REIMEL, J., June 10, 1955.—This is a complaint in equity filed by plaintiffs as taxpayers to restrain defendants from carrying into effect the provisions of Water Rent Regulation No. 3 as modified and from collecting or attempting to collect any rentals thereunder; from expending any moneys in placing said rental into effect. The complaint prays further that the regulation and the rentals imposed therein be declared illegal and invalid. To this complaint defendants filed a responsive answer and set up as new matter that a public hearing was held before Water Commissioner Baxter before Modified Water Rent Regulation No. 3 was filed. Thereupon plaintiffs filed a reply denying that the water commissioner gave consideration to the infirmities, discriminations and unreasonable provisions contained in Water Rent Regulation No. 3.

The cause was heard on September 30, 1954, and concluded on November 19, 1954, because of the inability of experts for both plaintiffs and defendants to

appear on consecutive days following the commencement of the trial.

## Findings of Fact

1. On November 21, 1952, the water commissioner promulgated Water Regulation No. 3. On December 20, 1952, after a public hearing, the water commissioner issued Modified Regulation No. 3.

2. The water rate schedules appearing in original Regulation No. 3 are identical to those appearing in Modified Regulation No. 3, and insofar as rates are concerned, differ only in that the original Regulation No. 3 did not contain a minimum schedule of rates for nonmetered customers.

3. The revenues which have been derived under Modified Regulation No. 3 are equivalent to those which would have been yielded by original Regulation No. 3.

4. The minimum meter rates under Regulation No. 3 were increased variously from 29.2 percent to 33.3 percent over the rates appearing in the 1948 rate ordinance, which was the rate schedule in effect immediately prior to the effective date of Regulation No. 3.

5. Regulation No. 3 made no increase in either the fixture rate schedule or in the 6-cent rate to charities.

6. Under the Home Rule Charter, the Water Department was, for the first time, placed on a self-sustaining basis. Section 5-801 of the charter requires the department to promulgate a rate schedule which will yield revenues sufficient to cover operating expenses and interest and sinking fund charges on any debt incurred or about to be incurred. Operating expenses are to include proportionate charges for all services performed by the Water Department for other departments, boards or commissions of the city. The Water Department is also required to pay the general fund for services rendered to the department by the city.

7. Prior to the enactment of the Home Rule Charter and the promulgation of Regulation No. 3, water and sewer rates had been established by ordinance of City Council. Section 5-801 of the charter confers the ratemaking power on the Water Department, subject to the requirement that it be exercised "in accordance with such standards as the Council may from time to time ordain".

8. Revenue records of the Water Department are kept on a cash receipt basis.

9. Actual reported revenues of the Water Department for the year 1953 were in the amount of $12,735,857.

10. The expenditures deemed necessary by the Water Department, for all phases of its operation, were submitted to the council in detail, prior to the passage of the Budget Ordinance for 1953.

11. These expenditures totaling $13,931,006, together with an increase in rates, were then submitted by the water commissioner to the finance committee of the council and to individual members of council.

12. Subsequent to the discussions and after consideration of the Water Department's proposed expenditures, the council adopted the Budget Ordinance for 1953 on December 9, 1952, appropriating to the water fund the sum of $13,085,057, the amount which the Water Department was authorized to expend.

13. The difference between the amount requested for the proposed expenditures and the amount appropriated was due to reductions made by council, in the items for personal services and for purchase of services.

14. The water rates to consumers in the City of Philadelphia for 1953, as fixed by Modified Regulation No. 3 of the Water Department of Philadelphia, are based upon a standard ordained by the council of

the City of Philadelphia and are in conformity with the provisions of the Home Rule Charter.

15. For the purpose of testing the reasonableness of the rates, the items for personal services, purchased services and materials, supplies and equipment included in the sum total of $13,085,057 were classified as follows:

| | |
|---|---|
| Administrative and engineering .... | $ 589,323 |
| Pitometer ....................... | 63,000 |
| Water supply pumping ........... | 3,269,879 |
| Filtration ...................... | 2,160,941 |
| Distribution system ............ | 1,489,231 |
| Registrar ...................... | 133,061 |
| Meter shop ..................... | 890,054 |
| High pressure fire service ........ | 153,776 |
| Garage ........................ | 177,058 |
| Building and equipment maintenance | 388,926 |
| Miscellaneous .................. | 41,015 |
| Indemnities ................... | 35,000 |
| Payments to other funds ......... | 539,100 |
| Capital financing .............. | 463,000 |
| Pensions ...................... | 104,100 |
| Debt service .................. | 2,587,638 |
| | $13,085,057 |

This is a reasonable and proper classification of such expenditures of the Water Department.

16. The aforesaid expenditures were further allocated between capacity consumer charges, $5,687,110, and output charges, $7,397,947.

17. To the foregoing output costs was added the sum of $105,000 for the cost of fluoridating the water on the assumption that fluoridation would commence in 1953, the cost of which would be an additional expense not covered in the appropriation to the water fund. This additional expense increased the total of expenses to $13,190,057.

18. From the above total of $13,190,057 was deducted the sum of $264,167 administrative and emergency expense payable by the sewer fund, $85,000 also payable by the sewer fund for operating fund for operating drainage pumping stations, $299,200 estimated savings in pumping and filtering costs, and $761,733 for high and low pressure fire systems and water supplied to city facilities. This is found to be reasonable, just and proper.

19. After making such deductions there remains the sum of $11,779,957. This sum is the reasonable and proper amount of revenue which should be derived from general consumers of water and is a proper basis on which to compute the rates to be charged.

20. The foregoing sum of $11,779,957 is calculated on the basis of 100 percent metering which provides a proper base for an equitable distribution of charges among all types of consumers, according to the demands they make upon the system.

21. The ratio between charges of 40 percent to capacity consumers and 60 percent to output consumers is fair and equitable and in accordance with the general practice in establishing municipal water rates.

22. At the time Modified Regulation No. 3 was promulgated, the revenue which the water rates could reasonably be expected to produce from the various classes of consumers was as follows: Metered consumers, $10,535,028; charities and schools, $40,000; schedule rate users, $2,613,924; or a total of $13,188,952.

23. From this total of $13,188,952 the sum of $675,759, representing a loss due to universal metering, is deductible. After making this deduction, a balance of $12,513,193 remains.

24. Deducting the figure of $11,779,957 (the minimum amount of revenue required from general water users) from the sum of $12,513,193, results in a dif-

ference of $733,236. This difference is a proper and reasonable cushion or safety factor. It is necessary to cover such contingencies in rate making, as error in estimating the probable revenue, the tendency of consumers to conserve water when rates are raised and the need to accumulate funds against rising expenditures for future years.

25. 1953 revenues contained receipts for excess water consumed but not billed in 1952, and consequently charged at the prior rates. With respect to metered customers, 1952 reported revenues represent split billings at both the rates in effect under the 1948 Ordinance and the present rates.

26. The estimated revenue from minimum rates amounting to $4,695,628 was obtained by multiplying the number of consumers of various types by the applicable minimum rates set forth in Modified Regulation No. 3.

27. The estimated revenue from excess consumption amounting to $5,839,400 was obtained by multiplying the amount of excess water by the rate of 70 cents per thousand cubic feet.

28. The estimate of the amount of said excess consumption of 3,104,000 million cubic feet for $5\!/\!8''$ and $3\!/\!4''$ users and 5,238,000 million cubic feet for users having larger than $3\!/\!4''$ meters, is a fair and reasonable estimate and is based upon past experience in excess consumption.

29. The estimated revenue from both minimum rates and excess charges for 1953 of $10,535,028 was fair and reasonable.

30. The minimum charges to metered consumers are fair and reasonable, the ratios between the various sizes of services are in mathematical proportion and do not discriminate against any particular size of service.

31. By taking the smallest size of service (½″ ferrule supplying a ⅝″ meter) as a demand unit of one, and assigning to each larger service a number of demand units in direct proportion to the increase in the diameter in square inches of the ferrule of each larger service over the diameter in square inches of the ferrule of the smallest service, an equitable basis of progression and increase of rates is obtained.

32. Based on the foregoing mathematical formula:

(a) The total number of demand units for all ⅝″ services in the city (including present schedule customers) is 473,946;

(b) the total demand units for all ¾″ services in the city (9,775 in number, multiplied by a ratio of 1.58 to 1) is 15,445; and

(c) the total demand units for sizes larger than ¾″ were calculated.

33. The total number of demand units for all sizes of services in the city calculated by the same method is 618,632.

34. The number of demand units (618,632) divided into the total of expenses alloted to capacity consumer costs ($4,661,210) produces $7.53 as the proper amount to be paid by one demand unit for a ⅝″ meter on a ½″ ferrule.

35. The minimum rate for a ⅝″ metered service as fixed by Modified Regulation No. 3, includes 4,000 cubic feet of water. At the rate of 70 cents per thousand cubic feet for excess or output cost water, the cost of 4,000 cubic feet of water is $2.80.

35. Adding together the capacity consumer cost for one demand unit ($7.53) and the output cost of 4,000 cubic feet ($2.80), the result of $10.33 affords the basis for the minimum rate of $10.50 established by Modified Regulation No. 3.

37. The minimum rate of $10.50 for ⅝″ services is just and reasonable and is properly related to the cost

of operating and maintaining the city's water supply system.

38. The minimum rates prescribed in Modified Regulation No. 3 increase in the same proportion as prescribed in the Ordinance of December 2, 1916, p. 499, and the Ordinance of November 9, 1948, p. 626.

39. The minimum rates for metered services are just and reasonable, are proportionately interrelated and do not discriminate between any other classes of users.

40. The excess rate of 70 cents per thousand cubic feet is obtained by dividing the total amount of water consumed by general consumers by the output costs and adding an amount to produce a safety factor.

41. The total amount of water consumed by general customers is as follows:

Water consumed by ⅝″ and ¾″
    meters users ................ 3,104,000 MCF
Larger than ¾″ meters users .. 5,238,000 MCF
Metered consumers minimum
    allowances ............... 1,750,000 MCF
Schedule rate consumers .....   719,656 MCF

                               10,811,656 MCF

42. The total of 10,811,656 divided by the output costs of $7,118,747 results in an excess rate of $.65843 per thousand cubic feet. This rate will produce only the exact amount of the theoretical revenue requirement without any allowance for a cushion or factor of safety.

43. A cushion or factor of safety of $733,236 is reasonable and represents the exercise of sound discretion and good judgment. It represents only 6.224 percent of the total revenue requirement of $11,779,957.

44. Applying this percentage (6.224 percent) to the tentative rate of $.65843 per thousand cubic feet

results in $.04098. This last figure is the proper amount to be added to the $.65843 rate to produce the safety factor of $733,236. When so added, the total produces a rate of $.69941 per thousand cubic feet, which may properly be rounded out to 70 cents per thousand cubic feet.

45. The rate of 70 cents per thousand cubic feet is fair and reasonable, and will, in conjunction with minimum, schedule and charitable rates, produce revenue adequate to meet the minimum requirements of the Water Department, plus a reasonable cushion or factor of safety.

46. The 1953 revenue from fixtures or schedule rate customers for the year 1953 was actually in the amount of $2,451,988, which figure represents total billing for service to such customers and would have been the same had Regulation No. 3 not been issued inasmuch as there was no increase in the fixture rate schedule in 1953.

47. The schedule rates as set forth in Regulation No. 3, as modified, consist of a flat charge to each consumer for each fixture or appliance connected to his water service.

48. The present schedule rates are unchanged from the schedule rates established by the Ordinance of Council approved November 9, 1948, p. 626, which amended the Ordinance of December 2, 1916. These schedule rates were apparently high in proportion to the former meter rates, but bear an entirely proper relation to the meter rates established under Modified Regulation No. 3.

49. Schedule rate users have unlimited use of water. The fixing of a higher rate than the rate for metered users is, therefore, not discriminatory because of this privilege.

50. The schedule user, whenever he so desires, may apply for and receive metered service.

51. The amount of water consumed by schedule rate users cannot be measured with exactitude.

52. Assuming the ratios for water consumption between the various classes of customers to be the same in 1953 as it was in 1951 when the last available comparable data was compiled, according to the water commissioner, the customers on charity rates consumed 13.9 percent of the revenue bearing water but contributed only 0.8 percent of the revenue.

53. In 1951, in which year the charity customers consumed 13.9 percent of the revenue bearing water, said customers contributed 1.017 percent of the total revenue.

54. The average cost per metered customer for meter reading, billing and collecting in 1954 was $1.14. A charity customer would have to consume 19,000 cubic feet of water in order to be billed an amount sufficient to meet that cost.

55. The charge per thousand cubic feet for metered customers, other than charity customers, having a ⅝ inch meter and using the minimum quantity allowed, or less, would range from $2.62½ to $10.50 compared with the flat charge of 6 cents per thousand cubic feet charged to charity customers.

56. Assuming water consumption in 1953 to be the same as it was in 1951, the last year for which comparable data is available, according to the water commissioner, the average metered customer paid $1.15 per thousand cubic feet whereas the average charity customer paid only six cents for the same quantity of water.

57. The cost of coal, power and chemicals necessary to produce 1,000 cubic feet of water for delivery into the distribution system was $.1432 in 1952. However, since each customer must also bear the cost of unaccounted-for water, or waste, the cost to him for those

three elements alone, for each 1,000 cubic feet of water consumed was $.201.

58. Defendants' expert, Nathan Jacobs, in table no. 9 of defendants' exhibit D-1, estimates the cost to the city for pumping, filtration and treatment to be 32 cents per thousand cubic feet.

59. Regulation No. 3 as modified provides a rate of six cents per thousand cubic feet to public and private schools and institutions of purely public charity. Such charitable rates which have been in existence in the City of Philadelphia since 1878 do not impose an unreasonable burden upon other classes of water users, are generally recognized and are in effect in many municipalities in the Commonwealth of Pennsylvania and elsewhere.

60. The revenues which the prescribed rates will produce may be further tested by a comparison and analysis of the actual revenues received for water service in 1953.

61. The revenues received from general users was $11,568,195.

62. The uncollected billings for 1953 total $929,960.47.

63. The two amounts, supra, total $12,495,155.

64. The $11,568,195 revenue actually collected in 1953 includes $465,149, which is attributable to billings for prior years.

65. Deducting this amount from $12,495,155, the result is $12,033,006.

66. This sum of $12,033,006 is the amount of revenue on an accrual basis which the rates produced from general users.

67. To obtain the total revenue of the Water Department, there should be added $743,733 for water service to the city, $264,167 for services payable by the sewer fund and $138,762 miscellaneous revenues re-

sulting in the total of $13,200,668. This total represents the revenue of the Water Department from all sources on an accrual basis.

68. On a cash basis, the total collections from all sources during 1953 amounted to $12,735,857. This figure included some revenue attributable to prior years and did not include all of the revenue due during 1953.

69. The actual total collections from all sources were more than one million dollars short of the budget appropriation.

70. The authorized expenditures as determined by the council total $13,085,057. If there is added to this amount a cushion or safety factor of $700,000, the total is $13,785,057.

71. The rates for 1953 on a cash basis produced $584,389 less than the authorized expenditures plus a cushion of $700,000.

72. The rates for 1953, on an accrual basis, produced only $115,279 more than the authorized expenditures of $13,085,057.

73. The sum of $445,700 for low pressure fire service is a reasonable amount to be charged to the city for the maintenance and use of its fire hydrants. Such sum divided by the number of such hydrants equals $20 per hydrant, the charge made in other municipalities. This figure is a reasonable basis on which to compute the charge for this service to the city.

74. The sum of $246,033 for high pressure fire service is the actual cost of operating the separate high pressure service. This amount is the reasonable and proper amount to be paid by the city.

75. The sum of $73,000 for the cost of water furnished to the city for police stations, fire stations, City Hall and other municipal buildings is fair and reasonable.

76. There is no significant number of commercial or industrial users remaining on schedule rates.

77. The Ordinance of April 11, 1918, requires every connection to a water main made after May 31, 1918, to be metered.

Plaintiffs' requests for findings of fact nos. 1, 2, 3, 4, 6, 7, 8, 9, 10, 12, 15, 16, 17, 18, 20, 23, 24, 25, 26, 27, 28, 30, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 48, 49, 50, 51, 52, 69, 70, 71, 72, 73, 74, 77 are affirmed, and nos. 5, 11, 13, 14, 19, 21, 22, 29, 31, 32, 33, 34, 35, 46, 47, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 75, 78, 79, 80 are denied. Defendants' requests for findings of fact are affirmed except nos. 8, 9, 55, 56, 57 which are denied.

## Discussion

Prior to 1953, water rents for the City of Philadelphia were established by ordinance of City Council. The last such ordinance was that of November 9, 1948.

On January 1, 1952, the Home Rule Charter became effective. Under the charter the Water Department was constituted a self-sustaining body. By the terms of the charter itself, the rates charged by the department are required to be sufficient to yield an amount equal to "operating expenses and interest and sinking fund charges on any debt incurred or about to be incurred". The department is further required to charge the city for services rendered to it and to pay to the city a charge based upon services rendered to the department by other departments or agencies of the city.

In the summer of 1952, the water commissioner concluded that in order for the department to remain self-sustaining he would be required to raise additional revenues. Nathan Jacobs and Donald Perry were called in to assist him in preparing a study upon which the new rates would be based.

In October, 1952, the department's budget request, which had previously been prepared by the commissioner and submitted to the finance director, was placed before City Council for approval. The total amount of the requested appropriations was $13,931,-006.

On November 11, 1952, Mr. Jacobs submitted a report to the commissioner in which he made certain recommendations regarding the proposed rate schedules.

On November 18, 1952, a preliminary draft of Regulation No. 3 was proposed. This draft eliminated the special rate for charities and increased the rates for nonmetered customers as well as for metered customers. The excess rate was increased to 64 cents per 1,000 cubic feet. Between November 18, 1952, and November 21, 1952, the water commissioner was engaged in a series of conferences as a result of which he learned that his budget requests had been reduced to $13,085,057, the amount ultimately approved, and was informed that as a matter of policy the charity rate should be reinstated and the fixture rate schedule restored to its 1948 level. Consequently, when Regulation No. 3 was finally promulgated, on November 21, 1952, these two changes were made and, at the same time, the excess rate was increased from 64 cents to 70 cents. These changes were made necessary by the policy considerations and reduction in the budget requests.

On December 20, 1952, Modified Regulation No. 3 was issued. Under the new schedule, minimum rates for metered customers were increased over the rates in effect under the 1948 ordinance. There was no increase in either the nonmetered rates or the charity rate. The charity rate is applicable to charities which includes public and private schools.

The total revenues actually received by the department in 1953 were in the amount of $12,735,857.35 and actual expenditures totaled $11,971,671.29, including expenditures for capital equipment having a useful life of more than five years in the total amount of $643,073.34, and capital budget finance in the amount of $463,000.

The principal complaints of plaintiffs are that the present rates are unreasonable, that the rates, especially in regard to the excess and charity rates, have been arbitrarily fixed, that there is discrimination, especially with respect to the charity rate and that the rates have been promulgated despite the failure of City Council to ordain standards as required by the charter. On all of these the city has joined issue.

This case involves an interpretation of section 5-801 of the Home Rule Charter which reads as follows:

"RATES AND CHARGES. In accordance with such standards as the Council may from time to time ordain, the Water Department shall fix and regulate rates and charges for supplying water, including charges to be made in connection with water meters, and for supplying sewage disposal services. The standards pursuant to which rates and charges shall be fixed by the Department shall be such as to yield to the City at least an amount equal to operating expenses and interest and sinking fund charges on any debt incurred or about to be incurred for water supply, sewage and sewage disposal purposes. In computing operating expenses, there shall be included proportionate charges for all services performed for the Department by all officers, departments, boards or commissions of the City."

The purpose of this section of the Home Rule Charter was to remove the determination of the water rate from the council and to place it in an administrative body. Simultaneously, there was reserved to council

the right to set standards, from time to time, which would not directly fix the water rates, but which would determine questions of policy in connection therewith.

Under section 5-801 council may ordain standards from time to time. There is a clear implication that the standards referred to in this connection are standards other than the limitation that the Water Department must be self-sustaining. The use of the word "may", particularly in conjunction with the phrase "from time to time", is most significant. The general rule of statutory construction is that the meaning and effect of words such as "may" and "shall" is always to be judged in their context. But if both are contained in the same instrument, it is presumed that the word "shall" is mandatory, and the word "may" is discretionary: Connell v. Kennett Township Board of School Directors et al., 356 Pa. 585, 589 (1947) ; Commonwealth ex rel. Margiotti v. Union Traction Co. of Philadelphia et al., 327 Pa. 497, 502 (1937).

When the council passed the Budget Ordinance for 1953, and included the expenditures by the Water Department totaling the sum of $13,085,057, as broken down into various classifications, it ordained the only standard required of the council by the Home Rule Charter and the Water Department was then charged with the duty of fixing a water rate schedule, designed to produce revenue in at least that amount. The final determination of the council of the total expenditures for the department of $13,085,057, after consideration of the request of the Water Department totaling $13,-931,006, and after conferences held between Commissioner Baxter, the finance committee, president of council, chairman of the committee concerned with Water Department problems and large groups of individual councilmen established the only standard required by section 5-801 of the charter in order that

the Water Department could fix the water rate schedule for 1953. The inclusion in the Budget Ordinance of expenditures of $13,085,057 was tantamount to a legislative finding that this sum was the amount necessary in order that the Water Department could supply an adequate amount of pure potable water, could cover operating expenses and interest and sinking fund charges and be self-sustaining. It then became necessary for the Water Department to fix rates based on that standard. Since the water revenue could not be anticipated with exactitude, the Water Department was justified in allowing a cushion of some $700,000 to assure, as far as possible, that revenue totaling not less than $13,085,057 would be forthcoming.

Section 5-801 contains the minimum standard for the fixing of water rates and charges. This standard is binding on both the council and the Water Department, and it provides that:

"The standards pursuant to which rates and charges shall be fixed by the Department shall be such as to yield to the City at least an amount equal to operating expenses and interest and sinking fund charges. . . ." See City of Philadelphia Petition, 83 D. & C. 581, 587, 588; U. S. v. Rock Royal Co-operative, Inc., et al., 307 U. S. 533, 577; Rohrer v. Milk Control Board, 322 Pa. 257.

Plaintiffs relied solely upon the testimony of one witness, namely, Henry H. Fick, an engineer, eminently qualified, who had examined the records, tabulations and data of the Water Department. Mr. Fick produced a pro forma exhibit in which, in some instances, he differed with some of the calculations of the Water Department. Mr. Fick testified that it was improper to allow a special rate for charities and that the historical recognition of the charitable institutions as a special class should be discontinued. He further

testified that a number of expenditures expressly authorized in the 1953 Budget Ordinance should be disallowed because it was his judgment that they were improperly included as operating expenses. It was his opinion that these disputed items should be classified as capital expenditures. He insisted that these expenditures, and also the amount of revenue which would be collected if the charities were charged the full rate less the charitable revenue received, should be considered as surplus revenue.

Mr. Fick testified that the 1953 Water Department revenue, on a pro forma basis, amounted to $14,339,-604. On the same basis if the rates in effect under the 1948 Ordinance were applied the total revenue would amount to $11,123,950. The budget appropriation for that year was in the sum of $13,085,057; actual reported expenditures of the department were $11,971,-671.29; and reported revenue $12,735,857, the surplus amounting to $764,186. An appropriation of $85,000 was allocated for drainage pumping in connection with sewer services and should have been charged to the sewer fund; the actual charge to the general fund for services rendered by the Water Department to the city was $764,733; the charge to the city for low pressure fire service was at the rate of $20 per hydrant and was based upon figures charged in other municipalities and there were no records from which the cost thereof could be determined. He testified that the department budget contains capital items having a useful life of more than five years in the sum of $643,073, that the adjusted operating income for 1953, applying the minimum adjustments to reported operating revenues and expenses was $2,554,526, applying the minimum adjustments to operating revenues computed on a pro forma basis at rates in existence under the Ordinance of 1948 would have approximated $932,819 and

under existing rates at least $4,148,273, and that the pro forma adjusted operating income for 1953 exceeds operating expenditures by 38.6 percent, and that the department expended $2,342,291 for debt service and $463,000 designated as capital financing, $400,000 of which was allocated to improvements in the distribution system and $53,000 for salaries of engineers employed on capital projects.

Mr. Fick testified that charity customers who benefited by the six cent rate per 1,000 cubic feet of water consumed 13.9 percent of the revenue bearing water but paid only 8 percent of the revenue therefor while the charge per 1,000 cubic feet to metered customers would range from $2.62½ to $10.50 per 1,000 cubic feet, that the cost of coal, power and chemicals necessary to produce 1,000 cubic feet of water was 14.32 cents in 1952. He further testified that if charity customers were to pay the excess rate of 70 cents per 1,000 cubic feet alone the department would receive approximately $1,100,000 in additional revenue.

Mr. Fick said that the charge to the city for water furnished to it in the sum of $73,000 is arbitrary because no basis for its computation exists, that the charge to the city for service to the low pressure fire system is at the rate of $20 per hydrant based upon a survey of rates charged by Chester and Lower Bucks County authorities and that the charge to the city for service to the high pressure fire system in the amount of $246,033 was based upon 1951 costs, excluding debt service and a proportionate share of the overhead.

Mr. Fick expressed the opinion that it is desirable and proper to charge nonmetered customers a higher rate than metered customers because of the temptation to waste water but that under Regulation No. 6 the rates to the former cannot be increased more than 25 percent over that for the preceding year, that while

the average bills for fixture rates is $14.54, as against bills for metered rate of $19.96, and that if the remaining 159,546 fixture rate customers came under the meter rate the revenue would be increased by $732,550.

The municipal defendants called as their first witness Mr. Nathan B. Jacobs, who has long been associated with the Water Department. He is a municipal utility expert who has been prominent in the field of public utility evaluation and rate making and has been employed by the Water Department to study and test the water rate schedule.

Mr. Jacobs participated in preliminary conferences which resulted in a tentative rate schedule. Preliminary studies were begun in June 1952 and conferences were held in October 1952. Modified Water Regulation No. 3 as established was developed from the tentative water rate schedule and the studies and conferences from which it evolved.

Mr. Jacobs produced certain tables used in testing the water rates and he testified that he analyzed the available data on past water revenue and the appropriations of the council. These figures were then broken down and screened against the function of the water service, and then the function was analyzed so that rates could be fixed generally in proportion to the service rendered. The rate schedule was considered step by step in all of its aspects, and Mr. Jacobs concluded that the rate schedule was fair and reasonable and not discriminatory, and did not create an undue burden on the consumers.

In addition to the testimony of Mr. Jacobs, the municipal defendants produced Water Commissioner Baxter, a registered professional engineer, who prior to 1932 served the City of Philadelphia in field offices on municipal and public works projects. Subsequent to 1932, until 1939, he was chief plant engineer of the

Bureau of Public Works Department, assistant director of public works, assistant chief engineer and chief engineer in the Public Works Department, and since 1952, water commissioner with full responsibility for the water supply and sewage system in the City of Philadelphia.

He testified that he formed a committee consisting of Mr. Jacobs, Donald Perry, who was associated with the Economy League for the Southern Division of Pennsylvania, and who has been on the staff of the Pennsylvania Public Utility Commission, and himself. The committee studied the formulation of a rate structure. Commissioner Baxter further explained that council was furnished with a detailed breakdown of the anticipated expenditures for 1953, amounting to $13,931,006, consisting of 30 pages and comprising exhibit no. 2. Commissioner Baxter conferred with members of council during the first three weeks of November 1952. He met with the finance committee of council, with the president of council, with the chairman of the committee concerned with Water Department problems, and with groups of councilmen ranging in number from 10 to 14. The subject of the discussions was the data contained in exhibit no. 2, and the rates which would be required if council adopted a budget based upon the information contained therein. As a result of the data supplied, and the meetings held, council, after deliberation, appropriated the total sum of $13,085,057. The Appropriation Ordinance was broken down into the same headings as those contained in the request included in exhibit no. 2. This ordinance was passed and approved on December 9, 1952. Commissioner Baxter testified that this date represented the first time that the Water Department knew the total sum which it was authorized by the council to spend, and also it represented the earliest date when

a final rate schedule could be prepared designed to produce revenue in an amount included in the Appropriation Ordinance. Accordingly, Modified Regulation No. 3 was promulgated on December 20, 1952, which set up the water rate schedule under consideration in this case, subsequent to a public hearing held thereon.

That rate schedule followed a pattern which had been in use in Philadelphia for many years. Historically, according to Commissioner Baxter, it was based on the Ordinance of 1916 and the Ordinance of 1948. Those ordinances established charges to metered customers according to the size of the ferrule or the meter employed. The basic calculation in the 1948 ordinance with respect to the various sizes of meters was based upon the size of the ferrules to which the meters were connected. The instant schedule of rates preserved the same rate ratios between the various sizes of meter users. The minimum charges were increased by approximately 31 percent with variations for rounding out the charges, and the excess use charge was uniformly increased 55 percent. The charitable rates and scheduled rates established by the two ordinances were preserved.

Commissioner Baxter testified that he was aware in July of 1952, when the budget requests of the Water Department were being prepared, that it would be necessary to increase water rates for 1953. Thereafter, preliminary studies were made by the commissioner, Mr. Perry and Mr. Jacobs, as described above. The rates studies were based on all of the material available at the time. Commissioner Baxter stated that on November 21, 1952, the original regulation no. 3 was issued although the budget ordinance had not yet been passed. That regulation was a temporary measure to permit the filing of a rate structure with the Department of Records for 30 days, pursuant to

charter provisions, and to permit time for hearings thereon. Commissioner Baxter explained that by November 18 or 19, 1952, it had become apparent that council would approve a budget ordinance allowing the expenditure of $13,085,057 by the Water Department.

The defense is that regulation no. 3 fixing the rates was issued on November 21, 1952, and was affirmed with modification following public hearings on December 20, 1952, effective January 1, 1953, that the rates were rechecked and a detailed study of the same completed on January 23, 1953, that the sums required for personal services, purchased services and materials, supplies and equipment totaling $13,085,057 were classified and adopted by city council in the passage of the operating budget ordinance; to these output costs was added $105,000 for fluoridation and there was deducted administrative and emergency expense payable to the sewer fund in the sum of $264,167, expense for operating drainage pumping stations in the sum of $85,000, savings in pumping and filtering costs in the sum of $299,200, and water supplied to the city in the sum of $761,733 leaving the sum of $11,779,957 as the amount to be derived from general consumers, calculated on the basis of 100 percent metering.

Defense further asserted that the revenue expected was $13,188,952 composed as follows: Metered customers, $10,535,028, schedule rate customers, $2,613,-924, and charities, $40,000. From this $675,759 should be deducted for loss due to universal metering leaving a difference of $733,236 as a cushion or safety factor, that the capacity consumer cost for one demand unit and the output cost of 4,000 cubic feet totals $10.33 and approximates the minimum rate of $10.50 for customers using five eighths inch meter, that the excess rate of 70 cents per 1000 cubic feet is obtained

by dividing the total amount of water used by general consumers by the output costs plus a safety factor, that the schedule rates bear a proper relation to the meter rates, that the rate to charities has been in existence since the year 1878 and does not impose an unreasonable burden upon other classes of consumers, that the sums of $445,700 for low pressure fire service, $246,033 for high pressure fire service, and $73,000 for water furnished to the city for its use are reasonable and proper and that on a cash basis the total receipts for 1953 are more than $1,000,000 short of the budget appropriation, and on an accrual basis the excess over the appropriation would amount to no more than $115,279.

Section 2-300 ($d$) of the Home Rule Charter provides:

"Expenditures for the repair of any property, for the regrading, repaving or repairing of streets, and for the acquisition of any property or for any work or project which does not have a probable useful life to the City of at least five years following the time the expenditure is made for it shall be deemed to be ordinary expenses to be provided for in the annual operating budget ordinance."

Under section 2-300 ($d$) of the Home Rule Charter the city is not compelled to pay for any property having a useful life of at least five years out of borrowed funds. There is nothing in law or reason which prevents the city from paying cash for its purchases. This provision was designed to prevent the financing of purchases of property having a life of less than five years as capital items. The charter's clear policy is to restrict and protect capital financing. The items in series 400, fixed capital, have a life of more than five years. They are, however, items which are to replace worn out or obsolete equipment.

The council determined that $463,000 of the appropriation to the Water Department should be earmarked to pay for a certain amount of capital improvements out of current funds. This is a uniform policy applicable to every city department. It is fully approved by the legislative branch of the city and appears to be based on sound financial principles.

Plaintiff's expert, Mr. Fick, expressed the opinion that the charity rate contained in modified water regulation no. 3 resulted in discrimination and caused the rate schedule to be unfair and unreasonable. The law is clear that the city has the right to furnish water without charge therefor for municipal and charitable purposes: Consolidated Ice Co. v. Pittsburgh et al., 274 Pa. 558, 565 (1922); McQuillin on Municipal Corporations (3rd ed.), vol. 12, sec. 35.37.

In answer to an attack on an ordinance fixing sewer rates, based on an alleged discrimination in favor of charities, schools and certain other institutions, the Supreme Court stated in Gericke et al. v. Philadelphia et al., 353 Pa. 60, 68 (1945):

"Complaint is made of section 3, providing special rates for charitable institutions, public and private schools, etc. The city's public schools pay for water consumed in the schools pursuant to an ordinance of July 26, 1935. Private schools and charitable institutions pay at the rate of six cents per thousand cubic feet pursuant to the ordinance of 1916. Philadelphia Housing Authority and Federal Housing Authority, under an ordinance of 1938, pay a water rate of forty cents per thousand cubic feet. With respect to the special rates charged in these circumstances, the learned court held that the existence of those ordinances fixing rates, whatever the effect might be if separately challenged in proper proceedings, could not be made the basis of striking down the whole ordinance, a conclusion in which we concur."

The water fund for 1953 actually is the first attempt to place the department on a realistic self-sustaining basis. The Home Rule Charter requires this to be done. It was therefore necessary to design rates which would meet the budget.

The minimum rate for one demand unit (⅝″ meter supplied by a ½″ ferrule) includes an allowance of 4,000 cubic feet of water. The output cost of water is $.70 per 1,000 cubic feet. The output cost of 4,000 cubic feet of water is $2.80. Adding this output cost of $2.80 to the capacity consumer cost of $7.35, the result, $10.33, as rounded out to $10.50, is the minimum rate established by Modified Regulation No. 3 for the ⅝″ meter supplied by a ½″ ferrule. The minimums for the larger sizes, with some slight allowances for rounding, are in direct proportion to the increase in the size of the ferrule. The ratio of increase in minimum charges between sizes of services is exactly the same as the ratios set in the Ordinance of December 2, 1916, and the Ordinance of November 9, 1948. The average increase in minimum rates in Modified Regulation No. 3 is 31 percent over the rates fixed by the 1948 Ordinance, again with slight variations as to particular sizes due to a rounding out of the exact figures. It would appear, therefore, that the minimum metered rates were developed in a scientific manner and are mathematically sound. The gradual progression of the rates is entirely justified, and they are neither arbitrary, discriminatory, nor have they been established capriciously.

The excess rate was determined pursuant to a proper formula which was not challenged by plaintiff's expert.

The output cost of a unit of 1,000 cubic feet of water is obtained by dividing the total output costs of $7,118,747 by the total number of cubic feet of water to be supplied (10,811,646 MCF). The result is $.65843

per 1,000 cubic feet. The safety factor is 6.224 percent of the total revenue requirement (from general customers) of $11,779,957. Applying this percentage (6.224) to the tentative rate of $.65843 per 1,000 cubic feet, the result is $.04098. This last figure added to the tentative rate produces a rate of $.69941 per 1,000 cubic feet, which differs infinitesimally from the $.70 rate fixed by Modified Regulation No. 3. Since the excess rate, as set in Modified Regulation No. 3, is designed to produce revenue sufficient to meet the capacity consumer costs plus a reasonable cushion, it is proper, fair and reasonable. See Shirk v. Lancaster City, 313 Pa. 158, 170 (1933).

Schedule rates are flat charges for each fixture or water device attached to the user's plumbing system. Consequently, a consumer under the schedule rate has an unlimited use of water. The amount of water which a schedule rate consumer uses cannot be measured. Schedule rates therefore can only be approximations. Based on their experience, the witnesses for the city assumed that the average schedule user draws 10,400 cubic feet per annum. A $5/8''$ metered user consuming the same amount of water would, at the present metered rates, pay $14.98. (Minimum $10.50 plus 6,400 cubic feet at $.70 equal $14.98.) The average minimum bill for schedule rate users is $15.29 (D1 table 9). On this basis, the schedule rate might be said to be slightly higher than the metered rate. The courts have consistently refused to condemn rates because of such a small differential: Consolidated Ice Co. v. Pittsburgh, 274 Pa. 558, 564 (1922).

In securing benefits and improvements of this and like nature, some discrimination and some preference may be made; they cannot be measured with mathematical exactness. There is no manifest injustice, unreasonable discrimination or undue preference: See

Rankin v. Chester Municipal Authority, 165 Pa. Superior Ct. 438, 450 (1949).

The burden of proving that the water rates fixed by the water commissioner are unreasonable, unfair or discriminatory is upon plaintiffs: Rankin v. Chester Municipal Authority, 165 Pa. Superior Ct. 438, 449, 450; Shirk v. Lancaster City, 313 Pa. 158, 170. Plaintiffs have not met this burden and the complaint must be dismissed.

## Conclusions of Law

1. The water rates to consumers in the City of Philadelphia for 1953, as fixed by Modified Regulation No. 3, are in conformity with standards ordained by the council.

2. The schedule rates are fair and equitable.

3. The apportioned minimum rates to metered users are fair and equitable.

4. The excess rate is fair and equitable.

5. The special rate to charitable institutions and schools is not a prohibited discrimination against other classes of users.

6. There is no undue discrimination in the rates as between various classes of metered users.

7. There is no undue discrimination in the rates as between metered users and schedule users.

8. The charging of a minimum rate is lawful and proper.

9. The coexistence of both metered rates and schedule rates is lawful, and affords no proper basis for objection to either rate.

10. The Water Department is entitled to exercise its discretion in the fixing of rates, and its judgment should not be set aside in the absence of proof of a clear abuse thereof.

11. The rates as fixed in Modified Regulation No. 3 will yield an amount sufficient to equal operating expenses, interest and sinking fund charges and a pro-

portionate charge for all services performed for the Water Department by all offices, departments, boards or commissions of the city.

12. The Water Department is required under the Home Rule Charter to set water rates which will produce sufficient revenue to cover its appropriation. In order to do so, it is a proper practice for the Water Department to provide for a reasonable cushion or safety factor.

13. The Water Department cannot be expected to set rates with such exactitude that no revenue will be collected above its appropriation and a reasonable excess of operating revenue over operating expense cannot be deemed unlawful.

14. Municipal rates may lawfully be designed to carry, in addition to operating expenses, a reasonable portion of capital expenditures where the accounting is on a cash basis and where such portion of capital expenditures is not unduly burdensome to the consumers.

15. Plaintiffs failed to sustain their burden of proving that the rates are unfair, unreasonable, excessive or discriminatory.

Plaintiffs' requests for conclusions of law nos. 1 to 24 inclusive are denied.

Defendants' requests for conclusions of law nos. 1 to 16 are affirmed.

### Decree Nisi

And now, to wit, June 10, 1955, the complaint is dismissed; costs and witness fees to be borne by plaintiffs.

The prothonotary is directed to give notice to the parties hereto or their respective counsel of the filing of this decree nisi and that unless exceptions thereto are filed within 20 days from the date hereof, this decree shall become final.